WELDON D. SMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27569. Promulgated July 31, 1951.

*Robert J. Lansdowne, Esq.*, for the petitioner.
*Sheldon V. Ekman, Esq.*, for the respondent.

138

142

OPINION.

RICE, *Judge:* The first issue is whether the $212,000 is "back pay" subject to the provisions of section 107 (d) of the Internal Revenue Code. Applicable portions are set forth in the margin.[1]

---

[1] SEC. 107. * * *

(d) BACK PAY.—

(1) IN GENERAL.—If the amount of the back-pay received or accrued by an individual during the taxable year exceeds 15 per centum of the gross income of the individual for such year, the part of the tax attributable to the inclusion of such back pay in gross income for the taxable year shall not be greater than the aggregate of the increases in the taxes which would have resulted from the inclusion of the respective portions of such back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under regulations prescribed by the Commissioner with the approval of the Secretary.

(2) DEFINITION OF BACK PAY.—For the purposes of this subsection, "back pay" means

Respondent argues that subsequent to January 1940 petitioner performed no services for his employer and therefore that section 107(d) is inapplicable. While it is true that section 107 (d) is subject to strict interpretation, *Norbert J. Kenny*, 4 T. C. 750, 754 (1945), we feel that respondent's argument is incorrect. Petitioner was an employee of A. M. & A. under a contract running for 10 years from January 1, 1935. Due to friction which developed between petitioner and others, his duties were limited so that by 1941 he had very little other than his title of general manager. But, petitioner continued in A. M. & A.'s employ until the expiration of his contract. He had an office in the store and was there every day except when on vacation. He did whatever he could in the performance of his duties. No one else was ever named general manager. Rather, a new position was created. Nor did A. M. & A. exercise its option to terminate its contract with petitioner. Petitioner was paid his base salary of $15,000 per year and A. M. & A. did not dispute his right to "additional compensation" provided for in the employment contract, but disputed the amount.

We feel, therefore, that the $191,966.26 received falls expressly within the definition of back pay found in section 107 (d) (2) (A) (ii) and that petitioner is entitled to treat it as provided in section 107 (d) (1).

The case of *Estate of Lester O. Stearns*, 14 T. C. 420 (1950), affd. (C. A. 6, 1951) 189 F. 2d 259, is distinguishable from this case, since in that case recovery was had for breach of contract following its termination by the employer. There, the petitioner did not continue as an employee while here petitioner continued as an employee until the expiration of his employment contract.

The settlement release between petitioner and A. M. & A. designated the manner in which the $212,000 was divided between the years involved in the dispute, and this division is not contested. But it failed to allocate each yearly portion between principal and interest. The parties are in agreement as to this allocation for the years 1938, 1942, and 1943, but disagree as to the allocation for the years 1944 and 1945. The petitioner claims that all of the amounts received in these latter years represent principal, since they are less than the amounts of principal he claimed for these years. The respondent, on the other hand, maintains that A. M. & A.'s computation is the correct one, namely, that the amount for each of these years is composed of both

(A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events:

\* \* \* \* \* \* \*

(ii) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; \* \* \*

principal and interest. The difference between A. M. & A.'s computation ($73,302.44) and the settlement figure ($71,625.06) for the year 1944 is conceded by respondent to be a decrease in interest for that year, its purpose merely being to round off the entire settlement to an even amount $212,000).

While respondent is a third party to the settlement, the method which he advocates is that of one of the parties to the settlement. This method appears to be the best method advanced. It is equitable and the basis for obtaining it is evident from the computations submitted. Nor has the petitioner introduced any evidence sufficient to overcome the prima facie correctness of respondent's determination. We therefore uphold the respondent's computation as set forth in our findings of fact.

The petitioner paid $25,000 during 1945 as legal fees incurred in the settlement for and the collection of the $212,000 from A. M. & A. The parties agree that this $25,000 is deductible but are in disagreement as to the method of doing so. The petitioner claims that the entire amount is deductible in 1945, the year in which it was paid, while the respondent asks that it be allocated over each of the years in proportion to the amount of back pay applicable to each year.

Back pay is afforded the treatment of allocation to applicable years simply because of the existence of section 107 of the Code. Without this section, the entire $212,000 would be income in 1945. Section 107 is silent as to expenses incurred in connection with any collection of back pay, and there are no regulations nor decisions which we have been able to find on the question. To limit application of section 107 to amounts received less expenses connected with collection is not a function for the Court, but rather is a task for the Congress if that is the result which they wish. We therefore hold that petitioner is entitled to deduct the $25,000 legal expense in 1945.

The second issue involves the $38,220 which petitioner deducted as a worthless debt in 1945. The respondent argues that this amount represented a capital investment rather than a loan, or, in the alternative, that it became worthless before the taxable year in question; or, if it was a debt, it was a nonbusiness debt.

Whether a contribution by a stockholder to a corporation is a capital contribution or a loan is a question which must be answered by a consideration of all the factors present in a particular case. *Sam Schnitzer*, 13 T. C. 43 (1949), affd. (C. A. 9, 1950), 183 F. 2d 70, certiorari denied, 340 U. S. 911 (1951). In a majority of cases of this type, there are factors indicative of either answer. The fact that deposits to Llenroc's account were begun almost immediately following incorporation and the fact that not several large deposits but a number of smaller ones (averaging several hundred dollars) were made in the

course of the life of Llenroc would seem to indicate that Llenroc was inadequately capitalized at its inception. While it is true that the destruction of the herd would account for a large portion of the $19,863.78 put in by petitioner during Llenroc's first year of existence, it would not account for the money put in before the summer of 1937 when the herd was destroyed. It is also true that no interest was provided for and that most of the advances had no evidences of indebtedness.

Counterbalancing these factors are a number of considerations. One of the major items is the fact that, unlike the situations in *Isidor Dobkin*, 15 T. C. 31 (1950) and *Edward G. Janeway*, 2 T. C. 197 (1943), affd. (C. A. 2, 1945) 147 F. 2d 602, the contributions in this case were completely disproportionate to stock holdings. While there were five equal stockholders, petitioner advanced $38,220, W. L. Houck, $3,000, C. T. Houck, $325, J. E. Houck, $125, and their mother (the fifth stockholder) nothing.

In addition, there is the fact that petitioner's claim as a creditor was allowed by Llenroc's trustee in bankruptcy. The money was carried on Llenroc's financial statements as a current liability. The parties intended the money to be loans. While this intent is not a controlling factor, it does have some evidentiary value. *Isidor Dobkin*, *supra*. Another factor indicative of a loan and which distinguishes this case from the *Dobkin* and *Janeway* cases is that in this case the questionable amount was not a portion of the original corporate investment, but, rather was money subsequently advanced to Llenroc.

Having considered the enumerated factors plus all others appearing in the record we hold that the $38,220 represented a loan by petitioner to Llenroc.

Under section 23 (k) (1) a deduction is allowed for "debts which become worthless within the taxable year." The respondent argues that the debt owed petitioner by Llenroc became worthless prior to 1945. He cites petitioner's allowed deduction in his 1944 income tax return for the worthlessness of his Llenroc stock as indicative of this. The year in which a debt becomes worthless is a question of fact for this Court to determine. *Redman* v. *Commissioner* (C. A. 1, 1946), 155 F. 2d 319; *W. A. Dallmeyer*, 14 T. C. 1282 (1950). Although Llenroc suffered a loss each year it was in operation, its financial statement of January 31, 1945, showed a deficit of $13,704.63 and a capital account of $20,000. Therefore, while a large part of the capital cushion was gone, it would still appear from the financial statement that petitioner's loan of $38,220 was not as yet worthless. It was not until the summer of 1945 that the mortgage was foreclosed and the following October that bankruptcy proceedings were begun. Up until the foreclosure, the parties still hoped that Llenroc would be successful. Con-

sidering all the facts, the debt was not worthless, as of January 31, 1945, and it was the events occurring during 1945 subsequent to January 31 which caused it to become so. Petitioner was correct, therefore, in claiming that 1945 was the year of worthlessness.

The last question to be resolved is whether petitioner suffered a business or a nonbusiness loss. Whether a taxpayer is entitled to a business deduction under section 23 (k) (1) of the Internal Revenue Code, or limited to a nonbusiness deduction under section 23 (k) (4) is a question of fact. Regulations 111, section 29.23 (k)–6. Section 23 (k) (4) of the Internal Revenue Code provides that in the case of a nonbusiness bad debt, "the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." Ordinarily a loss by an individual from a corporate investment is not considered a business loss, since the corporation and the individual are separate entities and the corporation, not the individual, carries on the business. However, where a person invests in a number of businesses and takes a part in their management over and above passively giving financial aid, it has been held that he is in the business of investing and personally participating in various ventures. *Henry E. Sage*, 15 T. C. 299 (1950); *Vincent C. Campbell*, 11 T. C. 510 (1948).

In the *Sage* case, the petitioner personally participated in a number of business ventures in which he had invested. We held that a loss suffered in one of the ventures was deductible as a business loss. The taxpayer was not a passive investor, nor was he concerned with only one venture. He was engaged in a number of activities and his assets were money plus personal services. The same issue present in that case is present in the one now before us. We feel that the *Sage* case is applicable. Petitioner was engaged in a number of business ventures, not only giving financial assistance, but also personally participating in the varied enterprises. As such, it was a part of his regular business.

We are cognizant of *A. Kingsley Ferguson*, 16 T. C. 1248, but feel it is distinguishable from the instant case on its facts. In that case, petitioner failed to prove that he expended time, money and effort sufficient to constitute a business of low-cost housing ventures. From all of the facts before us, this case, like the *Sage* case, indicates varied ventures for which petitioner did expend sufficient time, money and effort so as to constitute a business.

Under such circumstances we hold that petitioner may deduct the $38,220 as a bad debt for 1945 arising from a business in which he was regularly engaged.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

KERN, *J.*, dissents.

DISNEY, *J.*, dissenting: The majority holds that the petitioner's debt of $38,220 from Llenroc was not a "non-business bad debt" within the language of section 23 (k) (4) of the Internal Revenue Code—in other words, that it was incurred in the taxpayer's trade or business. I am unable to agree. In my opinion the concept of business has been here extended entirely too far. In *Ralph C. Holmes*, 37 B. T. A. 865, referring to *Hutchings* v. *Burnet*, 58 F. 2d 514, we said "the phrase 'carrying on a trade or business' as used in the revenue statutes bears a more restricted meaning than the general definition of what constitutes business transactions." Though perhaps in the broadest sense the petitioner's transactions here involved might be termed business matters, my view is that within the purview of the revenue statutes, particularly section 23 (k) (4) of the code, the debt involved was not a business debt. Not every monetary transaction even though made with the intent to profit comes within the concept of business within the revenue acts. In *Higgins* v. *Commissioner*, 312 U. S. 212, we find: "As the Circuit Court of Appeals observed, all expenses of every business transaction are not deductible."

Section 23 (k) (4) was added to the Internal Revenue Code by section 124 of the Revenue Act of 1942. The committee reports, both of the House Ways and Means Committee and the Senate Committee on Finance, covering section 124 state with reference to the determination whether a debt is incurred in the trade or business: "* * * the determination is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is 'incurred in trade or business' under paragraph (1) of that section." 1942–2 C. B. 573. It is clear I think that the concept of trade or business involved here is not different from that laid down in the *Higgins* case, *supra;* and it is equally clear that there a distinction is made between true business expenses and others in connection with a taxpayer's investments. It is my thought that Congress has never seen fit to broaden such concept of business as laid down in the *Higgins* case but that the instant case attempts so to do and to pull into the statutory idea of business matters which can be so denominated only by entertainment of a very broad and extra-statutory concept. Examination of the legislative history of this matter, in my view, clearly so indicates. As above stated, the statute originates in section 124 of the Revenue Act of 1942. Section 121 of the Revenue Act of 1942 is the basis for section 23 (a) (2) of the Internal Revenue Code providing, for the first time, for the deduction of "non-trade or non-business expenses." The Congressional committee reports, again of both House and Senate, covering section 121 (section 118 of the original House bill), emphasize the lack of any

change in the concept of trade or business by pointing out that the amendments made allow deductions "whether or not such expenses are paid or incurred in carrying on a trade or business" and allowing deductions for exhaustion and wear and tear "whether or not such property is used by the taxpayer in a trade or business." 1942–2 C. B. 570. Further indication that the essential concept of business was not altered, but that specific statutory additions, to the matter of deductions, were made, is the fact that section 23 (e)—as above seen furnishing substantially the same test as for section 23 (k) (1)—not only makes a sharp distinction between matters "incurred in trade or business" and those "entered into for profit though not connected with trade or business," but was not amended by the Revenue Act of 1942 as were section 23 (a) (by the addition of the non-trade or nonbusiness expenses) and section 23 (k) (by the addition of subsection (4) here involved). Section 23 (e) allows losses in two classes, that is, (1) in trade or business, and (2) in profit transactions, not trade-or-business connected. The lack of amendment in 1942 of section 23 (e) at a time when both sections 23 (a) and 23 (k), as to deductions and bad debts, were being amended, appears clearly to indicate that the distinction between transactions in trade or business and profit transactions outside thereof, was being continued. The majority view in the instant case however, in my opinion, merely because the petitioner's loss of about $38,000 could not be said not to be in a profit transaction, throws it into "trade or business." In the absence of a definite relaxation of the previous distinction between trade or business and other profit transactions outside of trade or business, I think the majority conclusion is unjustified. I note that the definition of a "non-business debt" in section 23 (k) (4) ties the matter closely to losses and therefore to section 23 (e), for the definition of "non-business debt" is, so far as here concerned, one that is other than a debt "the *loss* from the worthlessness of which is incurred in the taxpayer's trade or business." (Emphasis added.) In short, the definition in section 23 (k) (4) particularly excludes mere profit-transaction losses from the category of business debts. Unless the loss from the debt here in question was incurred "in the taxpayer's trade or business"—in the language of section 23 (e) (1), it is not a business debt; that is to say, "non-business debt" in section 23 (k) (4) includes those, loss from which is incurred in mere profit transactions not connected with trade, within section 23 (e) (2). Surely, therefore, the lack of amendment of section 23 (e) indicates plainly that the "non-business debt," newly provided in 1942 by section 23 (k) (4), was not intended broadly to cover mere profit-transaction debts or anything beyond the previously established and unamended concept of "trade or business," losses from which had been and continued to

be allowed under section 23 (e) (1). In the face of such treatment of this situation by Congress petitioner must perforce, and indeed contrary to clear Congressional intent, broaden the definition of trade or business in order to include the loss here involved. I strongly affirm that such treatment is not only not within the Congressional intent but is contrary to it. When Congress wished to add nonbusiness expense deductions, it did not broaden the previous concept of business but recognized it and added a new idea, section 23 (a) (2); likewise, when it wished to alter the treatment of "non-business debts," it did not enlarge the concept of business but its definition specifically limited "non-business debts" to those other than where the loss from worthlessness was incurred in trade or business, the exact expression used in section 23 (e) (1). Anything else is left a nonbusiness debt—and the petitioner's debt here is found among the residue. Had Congress intended to extend the coverage to business debts and not to limit them carefully to those "incurred in trade or business" under previous statutory definition, it could easily have so stated. The careful reference, in the definition, to loss in trade or business, as expressed in section 23 (e) (1), negatives the conclusion of the majority here. This thought is emphasized in the committee reports above referred to where, 1942–2 C. B. 573, it is stated that the character of the debt is to be determined by the relation which the loss bears to the trade or business of the taxpayer, requiring that relation to be "a proximate one in the conduct of the trade or business." The language does not refer to loss resulting from "trade or business or transactions entered into for profit." Yet this is the effect of the majority opinion. The definition of nonbusiness debts in section 23 (k) (4) depends upon the "loss" which in turn must and does refer to section 23 (e) because only there are losses allowed deduction. Thus we see that only a loss "incurred in the taxpayer's trade or business"—the subject of section 23 (e) (1)—is referred to, see that the concept of trade or business is not general, but special, and that only the preexisting concept was in mind, and see that general profit transactions outside of trade or business are specifically not covered. I think the majority opinion covers them into "trade or business."

I note also that the trade or business, proximate relation to which is required, must under the committee reports be one in which the taxpayer is engaged "at the time the debt becomes worthless." Several examples are given, including one where a debt incurred because of a loan from A while he was in the grocery business became worthless after he had sold that business but retained the claim. The loss is not, the report holds, a proximate incident to the conduct of trade or business in which A was engaged at the time of worthlessness. Under this thought it was incumbent upon petitioner in the instant case to show

the nature of his business at the time of the worthlessness of the debt. Though hesitating, because this is a fact question, to question the majority conclusion of fact, I must nevertheless point out that the evidence relied upon fails to indicate that the petitioner's business, at the time the debt became worthless, was such as to constitute trade or business even within the thought of *Henry E. Sage*, 15 T. C. 299, or *Vincent C. Campbell*, 11 T. C. 510, relied upon by the majority. The essence of those cases appears to be that if one is actively engaged in the affairs of a large number of transactions, corporate or otherwise, they may constitute his business. Thus in the *Sage* case there were numerous transactions and in the *Campbell* case petitioner was involved in the conduct of twelve corporations. Here the facts depended upon by the majority to constitute business are that petitioner had invested money in a number of enterprises, had investigated possibilities of many more, had purchased stock in small corporations and lent money or allowed his money to remain in such ventures, had put his money in the enterprises and participated in their management as officer or director, or both. None of these elements can be considered because they are not shown to have existed in the taxable year, under the test suggested by the committee reports as above seen. The same is true of petitioner's taking part in the management and lending money to a garage in which he and his brother were partners. Nothing indicates whether this was true in the taxable year. Obviously, I think, his ownership of stock in A. M. & A., leaving earnings with that company, does not establish business. He was not a director or officer after the "early 1940's," and even under the test of *Commissioner* v. *People's-Pittsburgh Trust Co.*, 60 F. 2d 187, the business of the corporation would not in 1945, the taxable year, be his business. I know of no case holding that merely being a general manager of a department store constitutes one's business. Moreover, his contract as manager terminated January 1, 1945. He had because of difficulties with A. M. & A. not, in fact, been general manager since April 1941 and had been engaged in litigation with the company since January 4, 1944. In addition petitioner was a stockholder and director of a bank and of Central Cleaning Plant. His ownership in Central is shown to have existed in the taxable year but neither of these companies can be relied upon to establish business because they merely required attendance at board meetings. Obviously he did not participate in the management of either one. Also, petitioner held 49 per cent of the stock of A. M. & A. Cleaning Corporation and was an officer and director and left some of his salary in the business, and spent several hours a day at the plant. However, the "business was sold in 1944 or 1945." I therefore must eliminate it as a basis for petitioner's business in the taxable year 1945 for it may have been sold in 1944. Lastly, petitioner, subsequent

to the year in question, became a stockholder, president, and manager of Oliver Gear Works. Such relationship after 1945 is obviously of no value to the petitioner's contention. The same is true of his present ownership and management of a building in Buffalo. Thus we find no showing that any of the alleged trades or businesses of the petitioner covered the taxable year 1945 except interest in Central Cleaning Plant, which required only attendance at board meetings and under no test of which I know could constitute petitioner's trade or business.

It should be noted, also, considering the reliance placed upon *Henry E. Sage, supra,* that it involved section 122 (d) (5) and net operating loss deductions, and not section 23 (k) (4). Moreover, section 122 (d) (5) requires merely that the deduction be "attributable to" the operation of a trade or business regularly carried on and is not tied in with loss under section 23 (e) as is section 23 (k) (4). In *Vincent C. Campbell, supra,* petitioners had a practice as a part of their business to advance to or leave money on open accounts in twelve corporations in the organization, in the ownership and operation of which they had been engaged since 1929. I consider the case no support for the majority conclusion here in this one.

I would therefore conclude both on the facts and on the law that the debt from the worthlessness of which petitioner lost about $38,000 in 1945 was a "non-business debt" within the intendment of section 23 (k) (4).

I therefore respectfully dissent.

TURNER, HARRON, OPPER, and RAUM, *JJ.*, agree with this dissent.