Estate of J. Stogdell Stokes, deceased, Provident Trust Company of Philadelphia, May Margaret Stokes, John S. Stokes, Jr., D. Robert Yarnall, Philip Price, and Percy C. Madeira, Jr., Executors v. Commissioner.
Estate of J. Stogdell Stokes v. Commissioner
Docket No. 30016.
United States Tax Court
1951 Tax Ct. Memo LEXIS 38; 10 T.C.M. (CCH) 1111; T.C.M. (RIA) 521343; November 21, 1951
*38 Petitioners' decedent was engaged individually in the business of exploiting patents either by organizing, financing, and actively participating in the management of companies organized to acquire or operate under such patents or by transferring such patent rights to existing companies in which he was a stockholder and active in the management thereof. Held, a loan of $14,627.48 by decedent to the Pullenlite Company was attributable to such business and is deductible in full as a business bad debt. Logan Morris, Esq., for the petitioners. Stanley W. Herzfeld, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the income tax return of J. Stogdell Stokes, deceased, for the taxable year January 1, to September 26, 1947, in the amount of $8,096.21. The sole issue to be decided is whether the amount of $14,627.48 is deductible in full as a business bad debt under section 23 (k)(1) or is a non-business bad debt under section 23 (k)(4) which should be treated as short-term capital loss. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. *39 The petitioners are the duly appointed, qualified and acting executors under the will of J. Stogdell Stokes, deceased. The income tax return of the decedent for the period here involved was filed by the petitioners for decedent with the collector of internal revenue for the first district of Pennsylvania. J. Stogdell Stokes, hereinafter referred to as the decedent, was a citizen and resident of the United States. He died on September 26, 1947. Over a period of years prior to his death, the decedent made loans on open account to the Pullenlite Company, a Pennsylvania corporation, in the total amount of $18,894.68, of which $4,267.20 was repaid, leaving a balance due amounting to $14,627.48. Such debt became worthless in 1947. Prior to May 1927, the decedent met one Rodney S. Pullen, who had an idea for a wooden book match which would ignite when pulled out of its package. The decedent thought it had good possibilities in competition with the paper book match industry and endeavored to get Stokes and Smith Company of Pennsylvania, of which he was president, to undertake the building of automatic machines for the manufacture of the match package and the matches and to market *40 them. His associates in the Stokes and Smith Company did not share decedent's enthusiasm over the idea and refused to undertake the proposition. The decedent then presented it to the Yarnall-Waring Company, of which he was one-third owner of the common stock and a vice-president and director. The three stockholders, owning all of the common stock of Yarnall-Waring Company, viz., D. R. Yarnall, Bernard G. Waring, and J. Stogdell Stokes, associated themselves with Rodney S. Pullen, the inventor, and this group entered into an agreement dated May 1, 1927, for the formation of a corporation under the name of Pullenlite Company for the purpose of receiving a license under the Pullenlite patent application and entering into a contract with the Yarnall-Waring Company for the development and manufacture of the automatic machine. Pursuant to this agreement, Pullen, Yarnall, Waring and the decedent organized the Pullenlite Company under the laws of Pennsylvania. A sole and exclusive license was executed by Pullen to the Pullenlite Company under date of August 29, 1927. Proceedings in the Patent Office were followed through, and U.S. Patent No. 1,694,864 was granted on December 11, 1928, covering *41 the match package. A number of other applications for patents covering inventions of Pullen relating to match packages and automatic machines for their manufacture were filed. Between 30 and 40 patents applicable to the business for which Pullenlite Company was organized were granted and about the same number of applications were pending when the decedent died. The decedent worked closely with the patent attorneys throughout the development years in connection with such patents and applications. On March 27, 1928, a supplemental agreement was made, signed by all of the parties above named, under which Pullen agreed to convey to Pullenlite Company full title to his inventions, patents, and applications for patents to supersede the exclusive license agreement above referred to. Yarnall-Waring Company proceeded with the work on the development of the automatic machine and made loans chargeable to Pullenlite Company to upward of $40,000 in carrying out the terms of the manufacturing license granted to it by the Pullenlite Company. The strong competition in the match book field and the heavy expenses of producing the automatic machines led the decedent and his associates in Pullenlite *42 Company to consider licensing the patents to another company operating in that field. The decedent, through personal connections, negotiated with the Diamond Match Company to take over the manufacturing of the machines (at that time a completed packaging machine had been constructed by the Yarnall-Waring Company) and the sale of the product. The Diamond Match Company was given an exclusive license covering all of the Pullenlite inventions, patents, and patent applications, under an agreement dated April 24, 1929. The Diamond Match Company made an initial payment for the license of $50,000 and thereafter made royalty payments totaling $55,000, the last of which was made in 1935. The Diamond Match Company had the right to cancel the exclusive license at the expiration of six years and to be relieved from the payment of the minimum royalties provided for therein. At the expiration of the fiscal year ending in 1935, the Diamond Match Company cancelled the exclusive license but continued to operate under a non-exclusive license for a number of years thereafter on a royalty basis. Such royalties were not enough to pay Pullen's salary and other expenses. Wooden matches, which were packaged *43 by the original machine, were more expensive to manufacture than paper book matches and, in addition, there were not as many wooden matches in each package as there were in the paper packages. This made it difficult to meet competition with the paper book matches and the decedent decided it would be necessary to develop a paper match with the package containing 20 matches. In order to develop a new machine and a new match pack it was necessary to keep Pullen on the job. Yarnall-Waring Company continued to pay some of the expenses and the decedent agreed to loan the Pullenlite Company on open account whatever amount was necessary in order to retain Pullen's services. These loans which began on June 30, 1936, and continued through 1939, resulted in an unpaid balance to the decedent in the taxable year of $14,627.48. The decedent contacted other match companies with a view to having them take out a license under the patents and succeeded in making an agreement with the Arrow Match Company in 1938. This company did not accomplish much under the agreement and it was cancelled near the end of 1940. Thereafter the decedent endeavored to interest other groups in taking out a license without *44 success. The Yarnall-Waring Company continued to lend money to Pullenlite Company until 1947 when it and the decedent both decided they would not put any more money into the venture. The Pullenlite Company ceased business in that year. Pullen died on June 20, 1944. Upon organization of the Pullenlite Company three of the incorporators, B. G. Waring, D. Robert Yarnall, and J. S. Stokes each contributed $200 toward the capital stock for their subscription to two shares and Pullen received two shares for his license. The holding of two shares entitled each of them to a one-fourth interest in the net assets of the corporation. During the period that decedent made loans to the Pullenlite Company he was vice-president, director, and a stockholder of the company. On December 28, 1937, he placed three-fourths of his holdings in trusts which he had created on December 31, 1935, with the Provident Trust Company of Philadelphia for his wife and children. The holdings of the decedent and of the trusts created by him represented a full one-quarter interest in the net worth of the Pullenlite Company. In 1901 Stokes and Smith Company of New Jersey was organized to build machines for making set-up *45 boxes under Smith patents. Decedent subscribed to 100 shares of the original stock issue, and paid $10,000 therefor. The assets of Stokes and Smith Company, New Jersey, except foreign patents and leased machinery in New Jersey, were transferred to the Stokes and Smith Company, a Pennsylvania corporation, in 1910. The decedent was elected president of both Stokes and Smith Companies at the time of their incorporation and continued in that position until his death in 1947. The decedent had an agreement dated December 18, 1903, with G. Howlett Davis, an inventor, in connection with the latter's 18 U.S. patents and six applications for U.S. patents, one Canadian patent and United States trade-mark "piano-phone", under the terms of which he was required to pay the inventor $2,500 in cash and deliver nine promissory notes for $2,500 each payable six months apart. At the same time, the decedent acquired title and ownership in the dies, tools, jigs, patterns, models, drawings, etc., pertaining to and useful for the manufacture of the piano-phone and other musical mechanisms covered by the patent protection. On December 28, 1903, the arrangements between the decedent and the said Davis *46 were transferred to the Stokes and Smith Company and the original agreement of December 18, 1903, was replaced by a new agreement dated December 28, 1903. The company also acquired the physical property in connection with the manufacture of the instruments. On March 17, 1906, the Electrelle Company was incorporated under the laws of Pennsylvania. Decedent was elected president and director. Under agreement dated May 1, 1906, the Stokes and Smith Company transferred to Electrelle Company all of the right, title and interest of the Stokes and Smith Company under the Davis patents and licenses, together with all of the jigs, tools, machines, drawings and other fixtures, instruments and materials connected with the building of the electrically operated piano covered by the patents. The business was abandoned about 1919. In November of 1909, the decedent purchased for $2,000 a one-third interest in the Simplex Engineering Company which had been organized in 1908. Its name was later changed in 1911 to Yarnall-Waring Company under which name it has developed into a large and successful corporation. In 1918, the decedent purchased additional shares for $15,000. The decedent was vice-president *47 and director until the time of his death and the owner of one-third of the stock of the Yarnall-Waring Company until 1935, when he placed it in trusts which he created at that time with the Provident Trust Company of Philadelphia for his wife and children. The Yarnall-Waring Company was engaged in the manufacture of power plant specialties, high-pressure valves, flow meters, and other similar products for power plants. Its business was based upon patents. In 1911, the decedent helped secure the American rights for the manufacture of the Lee V. Notch Meter, an English invention. It was an important power plant device for a good many years in the early days of the company. In 1915 the decedent contacted a Mr. Casky, who was the inventor of a clever hydraulic valve, and secured the rights for manufacturing and selling the valve for the Yarnall-Waring Company. The decedent, on one of his trips abroad, made a connection with the Edison-Swan Company of England, from which he secured for his company the right to build a porcelite heater, but the manufacture of which was abandoned because of patent difficulties. The decedent tried unsuccessfully to interest the Yarnall-Waring Company in the *48 Daniels Motor Company. In 1911, the decedent came in contact with the American Gasaccumulator Company, which held patent rights on flashing signals used mainly in lighthouses and channel buoys. He secured for the Stokes and Smith Company a manufacturing contract under the patents and under that contract the company built all the buoys for the Panama and Cape Cod Canals. Excerpts of the minutes of the board of directors of Stokes and Smith Company (of New Jersey) held January 17, 1921, and taken from the Minute Book are as follows: "The President reported that the Executive Officers had entered into Agreements with Walter Kellner, A.G., with regard to the formation of a German Company and presented the forms of contract at the meeting. On motion, duly seconded and unanimously passed, the action of the Officers in so doing was approved. "The President also reported that the British Cardboard Box Manufacturing Company, Limited, had been formed under the Companies of Great Britain for the purpose of manufacturing under the Stokes and Smith Patents in England, and that [*$ 20,000 in par value of the stock had been reserved for this company. That the Company had paid for [*] 12,400. *49 thereof and had received the shares; the remaining [*] 7,600. is to be paid for and issued as soon as the Box Machine Company needs the capital in the development of its business. He further stated that the loan from the Stokes and Smith Company of Pennsylvania, which was authorized for $100,000. had been made for [*] 20,000., which at the current rate of exchange had amounted to $77,606.53." The decedent had general charge of the business of Stokes and Smith Company. The principal business of the Company was the manufacture of paper box machinery and filling and packaging machinery. The Company operated under the following rights, most of which were brought to the Company by decedent: In 1925 a license from W. F. Schraffts & Sons Corporation under patents for a machine for inserting lacing in candy boxes; in 1926 a license from Gordon Machine Company under six patents relating to packaging machinery; in 1926 a license from Stanley H. Davis under patent for gluing machine; in 1927 a license from American Machinery Co. to build patented automatic packaging machines. (Modified in May, 1934); in 1928 a license from Charles L. Bond under patents for weighing machines useful in connection *50 with packaging machines; in 1928 a license from Shaw Insulator Co. under patents for moulding of plastic materials; in 1929 the going business of Small Manufacturing Co. and all patents covering machines for applying labels to boxes; in 1930 a license from Stanley T. Campbell to operate under U.S. Patents covering process for vulcanization; in 1930 a license from Ernest Eugene Barney to operate under patents protecting inventions relating to printing and graphic arts; in 1930 by purchase from Chester W. Larner and Eugene F. Gaines the stock of the Atlas Manufacturing Co. in order to obtain patentable inventions covering the manufacture of meat-cutting machines; in 1930 an agreement with Autokraft Box Corporation covering sale of patents relating to box wrapping system, reserving a license to Stokes and Smith Company; in 1931 a license from A. H. Balliet Corporation under patents for box-wrapping machine; in 1933 a license from Interstate Folding-Box Co. under patent rights covering the sealing of packages and cartons; in 1933 a license to operate under U.S. Patents from Franz Kurath, relating to moulding compositions and processes; in 1934 license rights from Frederic B. Clark under *51 patents in connection with improvements in laundry system; in 1935 from Theodore A. Feterwitz patent rights in connection with box-staying machines and a remodeled box-wrapping machine; in 1936 a license from Bakelite Corporation & Carborundum Company to operate under patents relating to synthetic resins; in 1937 a license from Transparent-Wrap Machine Corporation under patents covering automatic packaging machines; in 1937 a license from New Jersey Machine Corporation under various United States patents covering labeling machines; in 1939 a license from the Kellogg Company under various U.S. patents covering mechanisms for heat sealing in connection with packaging machines; in 1939 a license from Pfeiffer & Crossen under patents covering "stretch-wrap" and "stretch packer" wrapping machines; supplemental agreements were made in 1941, 1942, and 1948 modifying or continuing certain of the above agreements. Stokes and Smith Company had manufactured a printing press, which required a curved plate in order to be operated profitably. In December, 1916, the decedent brought Emil Novotny to Philadelphia with the idea of developing a printing plate of plastic material. They worked on developing *52 the plate for five or six years but it was not successful. In the course of working on the printing plate valuable plastics were developed, particularly phenol plastics, and from 1922 to 1934 the plastics end of the business was handled as a division of Stokes and Smith Company. In 1934, under an agreement with Novotny the plastics business was placed in a separate accounting unit on the books of Stokes and Smith Company and established as a division of that Company under the protection of patents and applications issued to Emil E. Novotny. In December 1937, the Plastics division of Stokes and Smith Company was incorporated as the Durite Plastics Company. The decedent was elected president and director of the Company. He was responsible for the initial contact with Novotny and for bringing the business to Stokes and Smith Company. In 1947 Durite Plastics Company was sold to the Borden Company. Stokes and Smith Company of New Jersey was registered as a foreign corporation in England and operated for a while under English Agents. In 1921 it joined in the formation of the British Cardboard Box Company, selling products made under patents held by Stokes and Smith Company (New Jersey). *53 The decedent made the contacts resulting in the agreements and formation of the English company. The decedent also made arrangements with Walter Kellner in Germany for the formation of a German company to manufacture under the Stokes and Smith Company (New Jersey) patents. The Stokes and Smith Company borrowed money at various times from 1914 until at least 1947. The decedent usually made the arrangements for the original borrowing while other officers usually took care of renewals. From August 1938, to October 7, 1941, in addition to the signature of the decedent as president of the company, the bank insisted upon the personal endorsement of the decedent. In 1938 the company's loans totaled $185,000 and from then on they started to increase. In 1939 they ran over $200,000. The decedent was engaged individually in the business of exploiting patents either by organizing, financing, and actively participating in the management of companies organized to acquire or operate under them or by transferring such patent rights to existing companies in which he was a stockholder and active in the management thereof. Opinion RICE, Judge: Whether a taxpayer is entitled to a business deduction *54 under section 23 (k) (1) of the Code or limited to a nonbusiness deduction under 23 (k) (4) is a question of fact. Under the facts of this case, we conclude that our holdings in Weldon D. Smith, 17 T.C. 135 (1951); and Vincent C. Campbell, 11 T.C. 510 (1948) are determinative here. In those cases the taxpayer invested in a number of businesses and took a part in their management over and above passively giving financial aid. Here, petitioners' decedent was not a mere passive investor, nor was he concerned with only one venture. While he was neither a banker nor moneylender, he was, as our findings of fact show, in the business of exploiting patents. Decedent's activities in this connection were continuous and regular throughout his business career, and it, therefore, follows that the debt owing from the Pullenlite Company which became worthless in 1947, is a business bad debt and deductible in full. Decision will be entered for the petitioners.