Vincent C. Giblin v. Commissioner.
Giblin v. Commissioner
Docket No. 32955.
United States Tax Court
T.C. Memo 1954-186; 1954 Tax Ct. Memo LEXIS 60; 13 T.C.M. (CCH) 1009; T.C.M. (RIA) 54292; October 29, 1954, Filed *60 Charles A. Morehead, Esq., and H. P. Forrest, Esq., for the petitioner. Rollin H. Transue, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income tax for 1945 in the amount of $21,866.37. The issue is whether the respondent properly disallowed a business bad debt deduction in the taxable year 1945 on the ground that the advances made by the petitioner were capital contributions. In the alternative, the issue is whether the advances were nonbusiness bad debts under section 23(k)(4) of the Internal Revenne Code of 1939. Findings of Fact The stipulated facts are found accordingly. The petitioner, a resident of Miami, Florida, filed his individual income tax return for 1945 with the collector of internal revenue for the district of Florida, at Jacksonville. The petitioner began the practice of law in 1918. During the taxable year in question he was actively engaged in the practice of law in Miami from which he received fees amounting to $64,045.38 and realized net earnings of $54,988.11 from such profession. Along with the practice of law the petitioner had for some years prior to 1945 *61 also engaged in promoting, managing, organizing, and investing in corporations and other business enterprises. In the latter part of December 1944, the petitioner and Jerry Donovan agreed to form a corporation for the purpose of operating a men's bar in Miami. On January 22, 1945, a corporation was organized under the name Stag Bar, Inc., with an authorized capital of $500, consisting of 10 shares of the value of $50 per share. The name was later changed to Downtowner, Inc., and will be hereinafter referred to as the corporation. Donovan had no funds and it was agreed that petitioner would put up the initial capital of $500. Five shares of the capital stock were issued to petitioner and 5 shares, to Donovan. It was further agreed that the petitioner would advance the corporation up to $10,000 with the understanding that all advances by the petitioner should be repaid before any dividends were declared and paid. Donovan was to devote all of his time to the management of the business. The petitioner later became dissatisfied with Donovan's operation of the business and on May 8, 1945, it was agreed that Donovan would transfer his 5 shares of the capital stock to the petitioner in exchange *62 for petitioner's note of $10,000. The note was later satisfied and cancelled for an undisclosed amount. On May 8, 1945, the petitioner arranged with Dinty Dennis to take over the management of the corporation, the petitioner transferring to Dennis 3 1/3 of his shares of the corporation's capital stock. By May 8, 1945, the petitioner had advanced to the corporation, exclusive of the capital stock, to equip and operate the corporation, the sum of $17,000. On that date a resolution was adopted authorizing the issuance to petitioner of 65 promissory notes aggregating $17,000. The notes, with interest at 4 per cent, were in varying principal amounts of $200, $250, and $300 and matured on various dates, the last note maturing 65 months after date. The first note for $200 was paid. After Dennis took over the management, the operations of the bar were enlarged to include a restaurant and lounge, necessitating additional expenditures for equipment and operation. Between May 8, 1945, and December 12, 1945, the petitioner made further advances to the corporation in an amount in excess of $34,000. The record does not disclose whether any notes were issued to cover such further advances. The *63 petitioner became dissatisfied with the operations of the business under the new management and, on December 8, 1945, Dennis resigned as president, director, and general manager. The petitioner acquired from Dennis the 3 1/3 shares issued to him on May 8, 1945. On December 12, 1945, the petitioner and his brother, Creston A. Giblin, entered into a written agreement. After reciting that the corporation was indebted to the petitioner on account of advances and loans in the sum of $51,668.23 as of December 8, 1945, and to better the corporation's financial status and provide it with capable management, it was agreed, in substance, that the petitioner would assign to Creston A. Giblin 5 shares or 50 per cent of the capital stock of the corporation and accept from the corporation a partial payment of the sum of $20,000 in cancellation of its indebtedness to him. Creston A. Giblin agreed that in consideration of the foregoing he would accept and assume the presidency, general managership, and a directorship in the corporation, and that he would loan the company not less than $15,000, which was not to become due or repayable in whole or in part until December 31, 1946, but which was to *64 be repaid with interest at 5 per cent per annum. At a special meeting of the directors of the corporation held on December 12, 1945, a resolution was adopted approving the aforementioned agreement. Creston A. Giblin was elected president, general manager, and a director, and accepted these offices. At this meeting the petitioner stated that in view of the corporation's financial condition he would accept its note in the sum of $20,000, payable on December 31, 1946, bearing interest payable on maturity at the rate of 5 per cent per annum. A resolution was duly adopted accepting the petitioner's offer and authorizing the president to execute the corporation's note for $20,000. On December 12, 1945, the corporation executed and delivered to the petitioner a note in compliance with the terms of the offer. The corporation thereafter functioned until 1950, when it was dissolved. Under date of December 12, 1945, the books of the corporation reflect the following entry: Notes payable - V. C. Gib-
lin
$16,800.00
Vincent C. Giblin - ad-
vances
34,868.23
Notes payable - V. C. Giblin
$20,000.00
Surplus (capital)
31,668.23 The books of the petitioner, under *65 the heading "Advances to Stag Bar, Inc.," show an itemized statement of the dates and the amounts which he loaned or advanced to the corporation in the total amount of $51,668.23 as of July 5, 1945, and a payment of $200 on June 13, 1945. On his individual return for the taxable year 1945 the petitioner claimed a deduction in the amount of $31,668.23 as a partial business bad debt loss. In determining his deficiency the respondent disallowed the claimed deduction with the following explanation: "(a) The advances to Stag Bar, Inc. in the amount of $31,668.23, claimed as a deduction for bad debts in the taxable year 1945 have been disallowed as such amount constitutes a contribution to the capital of Stag Bar, Inc. "If such advances should be determined to have been loans rather than contributions to capital it has not been shown that the advances to Stag Bar, Inc. in the amount of $31,668.23 became worthless in the taxable year 1945. Furthermore if advances in the amount claimed should be determined to have become worthless in the taxable year 1945, such loss would be considered a nonbusiness bad debt deductible only as a short-term capital loss." The petitioner was not regularly *66 engaged in the taxable year 1945 in making loans to corporation. No loans are shown to have been made to any corporation in 1945 other than the alleged loans to Stag Bar, Inc. Opinion LEMIRE, Judge: Assuming, without deciding, that the petitioner's advances to Stag Bar, Inc., in 1945 constituted loans rather than contributions to capital, we nevertheless decide that the loss is not deductible as a business bad debt under section 23(k)(1) of the Internal Revenue Code of 1939, because of our finding of fact that the petitioner, in the taxable year in question, was not engaged in the business of making loans to corporations. The advances, if loans, constituted nonbusiness bad debts within the purview of section 23(k)(4). A loss to give rise to a business bad debt deduction must be incurred in a business in which the taxpayer was engaged at the time the loss became worthless. The petitioner was a practicing attorney and in the taxable year 1945 earned considerable fees from the practice of his profession. While the record shows that for some years prior to the taxable year in question the petitioner also promoted, organized, and invested in various corporations and other business *67 enterprises, the evidence does not show he was so engaged in the taxable year. No instance is revealed of petitioner having made loans to any corporation other than to Stag Bar, Inc. The evidence establishes that the management and general supervision of Stag Bar, Inc., were left to other officers of the corporation. The petitioner was not in the restaurant business. Since the loans here involved were entirely apart from the business of managing the corporation, the necessary proximate relationship between the loss claimed and the business carried on is here lacking. Van Pelt v. Commissioner, 191 Fed (2d) 861, affirming a memorandum opinion of this Court, Aug. 10, 1950 [9 TCM 675,]; Jan G. J. Boissevain, 17 T.C. 325; Omaha Nat. Bank v. Commissioner, 183 Fed. (2d) 899; Commissioner v. Smith, 203 Fed. (2d) 310, reversing 17 T.C. 135, certiorari denied, 346 U.S. 816. Decision will be entered under Rule 50.