Edmund Thomas Gulledge, Sr., and Lucy Coulter Gulledge, Husband and Wife v. Commissioner.
Gulledge v. Commissioner
Docket No. 59548.
United States Tax Court
T.C. Memo 1957-29; 1957 Tax Ct. Memo LEXIS 223; 16 T.C.M. (CCH) 134; T.C.M. (RIA) 57029; February 13, 1957
*223 1. During the taxable years 1951 and 1952 and for many years prior thereto, petitioner Edmund Thomas Gulledge, Sr., was engaged in the business of farming. He devoted a part of his land to the raising of peanuts. In 1946, he and three other individuals organized a corporation to engage in the business of shelling and marketing peanuts. During the years 1949 to 1952, inclusive, he advanced a total of $ 46,367.04 to the corporation. Held, the advances were loans to the corporation rather than capital contributions. Held, further, a part of the loans became entirely worthless in 1951 and the remainder was entirely worthless in 1952 when made pursuant to the agreement of November 29, 1951. Held, further, the worthless debts were deductible as nonbusiness rather than business bad debts. Held, further, the worthless debts are not deductible under either section 23(a)(1) or (e)(2), I.R.C. 1939. 2. During 1953, petitioner constructed a pond on his property primarily for his cattle and for irrigation purposes. Held, the cost of constructing the pond is a capital expenditure and is not deductible as a business expense. Sec. 24(a)(2), I.R.C. 1939. Braxton C. Wallace, Esq., Textile Building, *224 Greenwood, S.C., for the petitioners. Raymond Whiteaker, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent has determined deficiencies in the income tax of petitioners as follows: Taxable Year
Amount
December 31, 1951
$ 13,768.20
December 31, 1952
5,672.06
December 31, 1953
None
The issues are: (1) Whether petitioners are entitled to a business bad debt deduction in each of the years 1951 and 1952 as a result of certain advances which petitioner Edmund Thomas Gulledge, Sr., made during the years 1949 to 1952, inclusive, to a corporation of which he was a stockholder and officer, and (2) whether petitioners are entitled to a deduction in 1953 (for carryback purposes) of $ 1,000 expended in the construction of a pond. As to the first issue, the respondent determined that petitioners were not entitled to deductions for business bad debts but were entitled to deductions for nonbusiness bad debts. He now contends that the said advances were contributions to capital and not loans but, should the Court find that the said advances were loans, he then contends that the advances were not "entirely" worthless in either 1951 or 1952, and by an amendment *225 to answer asks the Court to find increased deficiencies in the event that either one of his present contentions is upheld. Petitioners oppose both of these contentions. They insist they are entitled to deductions, under section 23(k)(1) of the Internal Revenue Code of 1939, for business bad debts or, in the alternative, either to deductions for ordinary and necessary expenses under section 23(a)(1) or deductions for losses under section 23(e)(2) of the 1939 Code. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioners are husband and wife who reside at Wedgefield, South Carolina. The transactions in question are those of the husband, Edmund Thomas Gulledge, Sr., and he will hereinafter be referred to as the petitioner. On January 31, 1952, petitioners filed a joint U.S. individual income tax return for the calendar year 1951 with the then collector of internal revenue for the district of South Carolina. On this return petitioner deducted $ 27,500 as a "casualty" and reported a net income of $ 25,200.94. The respondent disallowed the claimed deduction of $ 27,500 and allowed in place thereof a capital loss deduction of $ 1,000, thereby *226 adjusting petitioners' net income to $ 51,700.94 In the deficiency notice the respondent explained these two adjustments as follows: "(a) On your return you deducted the amount of $ 27,500.00 as casualty. This amount represents cash advances to the Sumter Peanut and Produce Corporation, Sumter, South Carolina. It is held that this amount represents a non-business bad debt rather than a business bad debt. Accordingly, this amount has been disallowed as a deduction and the amount of $ 1,000.00 has been allowed as a capital loss in item (b) below. Section 23(k)(4) of the Internal Revenue Code. "(b) The amount of $ 1,000.00 representing a non-business bad debt, has been allowed as a capital loss as explained above. Section 117(d)(2) of the Internal Revenue Code." On January 30, 1953, petitioners filed a joint U.S. individual income tax return for the calendar year 1952 with the director of internal revenue for the district of South Carolina. On this return, petitioner deducted $ 18,867.04 as a "Casualty (Sumter Peanut Corp. Loss)" and reported a net income of $ 11,332.53, which included a net capital gain of $ 467.50. The respondent disallowed the claimed deduction of $ 18,867.04, allowed *227 in place thereof a capital loss deduction of $ 1,467.50, and also a net operating loss deduction carry-back from 1953 of $ 1,402.88, all of which he explained in his deficiency notice as follows: "(a) On your return you deducted the amount of $ 18,867.04 as casualty (Sumter Peanut Corporation loss). It has been determined that the loans to Sumter Peanut and Produce Corporation in 1952 amount to only $ 6,550.00. It is held that these loans represent a non-business bad debt rather than a business bad debt. Accordingly, the amount of $ 18,867.04 deducted on your return has been disallowed and the amount of $ 1,467.50 has been allowed as a capital loss in item (b) below. Section 23(k)(4) of the Internal Revenue Code. "(b) On your return you reported capital gain of $ 467.50, representing 50 percent of total net capital gains of $ 935.00. It is held that the loans explained in item (a) above represent a non-business bad debt allowable as a capital loss to the extent of capital gains plus $ 1,000.00. Accordingly, the amount of $ 467.50 reported as capital gain has been eliminated and a net capital loss of $ 1,000.00 has been allowed, resulting in a total additional deduction of $ 1,467.50. *228 Section 117(d)(2) of the Internal Revenue Code." "(c) A net operating loss carry-back from 1953 has been allowed as a deduction for 1952, in accordance with Section 122(c) of the Internal Revenue Code. "Net operating loss 1953, as
corrected
$ 2,402.88
Less capital loss deduction
for 1952
1,000.00
Net operating loss deduction
for 1952
$ 1,402.88"
On February 1, 1954, petitioners filed a joint U.S. individual income tax return for the calendar year 1953 with the director of internal revenue for the district of South Carolina, and reported a net income of $ 1,033.11. After making four adjustments to the reported net income, the respondent arrived at a net operating loss for 1953 of $ 2,402.88 instead of a net income. One of the adjustments was the disallowance of $ 1,000 claimed by petitioner as a deduction for machine hire. In his deficiency notice the respondent explained this adjustment as follows: "(a) On your return you deducted $ 2,371.75 as machine hire. It has been determined that $ 1,000.00 of this amount represents the cost of constructing a pond and is a capital expenditure; accordingly, this amount has been disallowed as a deduction. Section 24(a)(2) of the Internal Revenue Code." *229 Petitioner is a farmer. He has been farming for the past 30 years, raising cotton, peanuts, potatoes, small grain, and livestock. He operates about 1,500 to 2,000 acres and at one time had about 400 acres planted in peanuts. Until about 1942, petitioner also operated a general store in connection with his farm. At some unstated time he also ran a cotton gin. He loaned a little money all his life in connection with one or more of these operations. He had about 32 tenant farmers to whom he made advances, and altogether he had about 300 accounts on his books. Prior to 1946, petitioner and the other farmers in Sumter County had no local market for their peanuts. Because of this situation petitioner and two other farmers whose names were W. J. Lawrence and H. C. Edens, together with T. O. Bowen, the county agent, took a trip to South Georgia to ascertain, if possible, what profits they could make from a mill in Sumter. They also went to Suffolk, Virginia, and talked with representatives of several peanut companies as to the feasibility of establishing a mill in Sumter on a profitable basis. Upon receiving encouragement, these four individuals, returned to Sumter and organized the Sumter *230 Peanut and Produce Corporation (some times referred to herein as the corporation) on July 26, 1946. Originally, these individuals intended to invest only $ 6,000 each in capital stock of the corporation. Bowen borrowed $ 6,000 to pay for his stock. Later, the outstanding capital stock was increased to $ 48,000 and, on December 31, 1947, it was owned as follows: Petitioner
155 shares
$ 15,500
W. J. Lawrence
155 shares
15,500
H. C. Edens
110 shares
11,000
T. O. Bowen
60 shares
6,000
Total
480 shares
$ 48,000
By establishing the plant and a market for peanuts, petitioner was able to obtain from $ 25 to $ 30 per ton more for his peanuts than he had obtained in the past. On or about March 25, 1948, Edens and Bowen sold their shares of stock to petitioner and Lawrence and, after such sale, petitioner and Lawrence each owned 50 per cent of the stock of the corporation, or 240 shares each. On June 30, 1950, petitioner and Lawrence each sold 80 shares of stock in the corporation to R. L. Colvin, after which each of the three shareholders owned 160 shares or a one-third interest in the Sumter Peanut and Produce Corporation. On or about September 30, 1949, petitioner advanced to the corporation $ 7,317.04 and *231 Lawrence advanced $ 7,317.05. On or about June 30, 1950, petitioner and Lawrence each advanced $ 5,000. During February 1951, petitioner, Lawrence, and Colvin each advanced $ 2,500 to the corporation. No notes were taken for these advances and no interest was agreed upon. The bookkeeper by mistake entered these advances on the books of the corporation as "donated surplus." These advances were all intended to be loans and were in fact loans. It had been the practice of the corporation to issue warehouse receipts for the peanuts as they came into the plant. These warehouse receipts were to be paid off before the peanuts were shelled. Late in 1951 it developed that the manager at the corporation's plant had been shelling peanuts before the payment had been made. The market for peanuts had declined by about 6 or 7 cents a pound, or anywhere from $ 100 to $130 a ton on shelled peanuts, and it looked as if the corporation would not have funds with which to pay the warehouse receipts. Petitioner and the other two stockholders of the corporation called in W. E. Pate of the state warehouse system of the Agriculture Department and explained the situation to Pate. The conference with Pate resulted *232 in the execution of an agreement signed by the three stockholders, petitioner, Lawrence, and Colvin. The body of the agreement was as follows: "WHEREAS, the undersigned Stockholders and Directors of Sumter Peanut & Produce Corporation, do hereby assume responsibility and personal liability for the retirement of all outstanding Warehouse receipts in State Warehouses Nos. 1179-G, 1096-G, and 1233-G and "WHEREAS, the undersigned parties do admit that they are responsible for said warehouse receipts no matter how many and what amounts, together with all storage charges thereon and agree to fully retire and counsel the same on or before the 15th day of December 1951. "NOW, THEREFORE, in consideration of the premises, we, the undersigned, do hereby bind ourselves to retire and cancel all of said warehouse receipts, together with storage on or before December 15, 1951. "This Agreement shall be binding upon the parties hereto, their heirs and assigns. "Witness the hand and seal of the parties hereto this the 29th day of November 1951." In the execution of the above agreement the three stockholders of the corporation advanced further sums to the corporation or to the trustees in liquidation, *233 as hereinafter shown, on approximately the following dates and in the following amounts: Approximate
Date of
By
By
By
Advance
Petitioner
Lawrence
Colvin
Dec. 15, 1951
$ 25,000
$ 20,000
$ 15,000
Jan. 15, 1952
2,000
2,000
2,000
Feb. 1, 1952
3,000
3,000
3,000
Mar. 15, 1952
1,550
1,550
1,550
Total
$ 31,550
$ 26,550
$ 21,550
These amounts were set up on the books of the corporation as liabilities under the caption of "Refinance Loan Account." No notes were given for any of the advances nor was there any agreement as to interest. On January 3, 1952, the stockholders of the corporation caused all of the corporation's property to be transferred to petitioner and Lawrence as trustees, "IN TRUST, to take and hold said property, rent out the same, sell said property, and apply proceeds of said sale upon the indebtedness due by the grantor, and should any surplus remain, then to divide the same among the said W. J. Lawrence, Jr., E. T. Gulledge, and R. E. Colvin in proportion to the amount each of the said three has invested in said Sumter Peanut and Porduce Corporation." On January 4, 1952, pursuant to notice duly published on three occasions in the Sumter Daily Item of Sumter, South Carolina, a meeting of the stockholders *234 of the corporation was held, and the following resolution was unanimously adopted: "RESOLVED: that the charter be surrendered and the corporation be liquidated and the real estate be conveyed to the stockholders and that an application be made to the Secretary of State for a dissolution of the Charter." A balance sheet prepared by the accountant for the corporation showing the assets and liabilities in the hands of the trustees, as taken from the books as of July 31, 1952, is as follows: Assets: Cash
$ 1,136.34
Accounts receivable
12,198.07
Inventories
5,043.00
Deposits and prepaid insurance
296.83
Total current assets
$ 18,674.24
Total current assets
$ 18,674.24
Land
$ 1,960.48
Buildings
23,306.35
Machinery and equipment
42,851.52
Furniture and fixtures
353.50
$ 68,471.85
Less depreciation
17,164.39
Total fixed assets
51,307.46
Total assets
$ 69,981.70
Deficit
129,469.73
$ 199,451.43
Liabilities and Capital: Accounts payable
$ 1,025.96
Notes payable (bank)
8,000.00
Mortgage payable (bank)
30,000.00
Reserve for payroll tax
641.38
Loans from stockholders
111,784.09 *
Total liabilities
151,451.43
Capital stock
48,000.00
$ 199,451.43
On *235 January 21, 1954, petitioner, as the highest bidder, bid in at public sale, after due public advertisements of the sale, all of the property of the corporation then held by the trustees for $22,000 and also assumed an existing mortgage on the property of $10,000, thus making the total purchase price $32,000.
None of the advances which petitioner made to the corporation as previously set forth, in the total amount of $46,367.04, was a contribution of capital.
The advances which petitioner made to the corporation during 1952 were entirely worthless at the time they were made pursuant to the agreement entered into on November 29, 1951.
The loss resulting from the debts which became worthless had no relation to any trade or business in which the petitioner was engaged at the time the debts became worthless.
2. In 1953, petitioner built a pond on his property primarily for his cattle and for irrigation purposes. The cost of the pond was about $4,500. About $1,000 of this cost represented machine hire which petitioner deducted as an ordinary and necessary business expense.
Opinion
The respondent's determination that the deductions claimed by petitioner in 1951 of $27,500 and in 1952 of $18,867.04 *236 were nonbusiness rather than business bad debts is prima facie correct, and the burden of proof is upon anyone who attacks that determination. See our Rule 32, and Avery v. Commissioner, (C. A. 5, 1927) 22 Fed. (2d) 6 [1 USCT ¶ 254]. Both parties now contest the determination but seek different results.
We do not agree with respondent's first cotnention that the advances made by petitioner to the corporation were contributions of capital rather than loans. Petitioner paid in to the corporation $15,500 for his 155 shares of stock held on December 31, 1947. He later purchased some of the shares held by Edens and Bowen and sold 80 shares to Colvin. After June 30, 1950, he owned 160 shares. Petitioner has made no claim for any loss due to his stockholdings. The evidence clearly shows that the total advances here in question made by petitioner of $46,367.04 were intended as loans. The fact that the bookkeeper mistakenly recorded $14,817.04 of the advances as donated surplus is not controlling. Nor does the fact that no notes were given or interest agreed upon make the advances capital rather than loans. The evidence clearly establishes that petitioner never intended the advances made by *237 him to be other than loans. He had no doubt as to the repayment of all of the advances except the sum loaned in 1952 and the advances made in that year were made by reason of a definite commitment entered into in 1951. The fact that the repayment of the 1952 loans of $6,550 was doubtful when made does not change the character of the advances as loans when made in the light of the commitment to make such advances. Cf. Eckert v. Burnet (1931) 283 U. S. 140 [2 USCT ¶ 714], affirming the Court of Appeals for the Second Circuit at 42 Fed. (2d) 168 [1930 CCH ¶ 9395], which in turn affirmed our decision reported at 17 B. T. A. 263 [Dec. 5400]. We hold therefore, that respondent has failed to prove that any part of the advances of $46,367.04 was a contribution of capital rather than a loan.
Neither do we agree with the respondent's second contention that the debts were note "entirely" [1] worthless when charged off by petitioner in 1951 and 1952. He bases this contention mainly on the ground that as of July 31, 1952, the trustees held assets of the corporation totaling $69,981.70 with which the trustees could have paid off all the non-stockholder liabilities of $39,667.34 and have had $30,314.36 *238 left to apply on the loans from stockholders of $111,784.09. This might be true if the assets were worth par. The trustees, however, after trying to sell the assets for over a year finally put them up for sale at public auction at which time petitioner as the highest bidder bid them in for only $22,000 and assumed an existing mortgage thereon of $10,000. We hold that the respondent, on whom the burden rests on this point, has failed to prove that the debts were not entirely worthless at the time of their charge-off by petitioner. Regarding petitioner's contention that the debts were business rather than nonbusiness, it is necessary for petitioner to prove that in the years the debts became entirely worthless petitioner was engaged in a trade or business, and that the loss resulting *239 from the debts becoming worthless bore a proximate relation to such trade or business. Jan G. J. Boissevain, 17 T.C. 325; Commissioner v. Smith, (C.A. 2, 1953) 203 Fed. (2d) 310, reversing Weldon D. Smith, 17 T.C. 135; Hickerson v. Commissioner, (C.A. 2, 1956) 229 Fed. (2d) 631, affirming a Memorandum Opinion of this Court [13 TCM 1180,; T.C. Memo. 1954-237]; Dominick J. Salomone, 27 T.C. - (Jan. 17, 1957). Petitioner has shown that he has been in the business of farming for the past 30 years. But the loans here in question have no proximate relation to that business. They were all made to further the business of the corporation. The business of the corporation is not petitioner's business. Dalton v. Bowers, 287 U.S. 404; Burnet v. Clark, 287 U.S. 410. Petitioner is not in the business of lending money to corporations generally. He did testify that he made some small loans to sharecroppers but to what extent we do not know. It thus appears that petitioner was not engaged, during the taxable years in question, in any trade or business other than that of farming, and that this was separate from the business of the corporation. We hold, therefore, that petitioner has failed *240 to establish that the debts in question were business rather than nonbusiness as determined by the respondent. Since we have held that the advances which petitioner made to the corporation are loans and are therefore debts of the corporation, we think it follows that there can be no merit in petitioner's alternative contentions that the losses resulting from the worthlessness of the debts are deductible either as deductions for ordinary and necessary expenses under section 23(a)(1) or deductions for losses under section 23(e)(2) of the 1939 Code. These sections, together with section 23(k), are all mutually exclusive. Spring City Foundry Co. v. Commissioner, (1934) 292 U.S. 182. 2. In 1953, petitioner built a pond on his property and deducted a part of the cost thereof as a business expense. The respondent disallowed the deduction in accordance with section 24(a)(2) of the Internal Revenue Code of 1939, which provides that in computing net income no deduction shall in any case be allowed in respect of "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate * * *." We hold that the respondent did not *241 err in disallowing the deduction. Decision will be entered for the respondent. Footnotes
*. A summary of these loans is as follows: ↩
Petitioner
$46,367.04
Lawrence
41,367.05
Colvin
24,050.00
--------------
$111,784.09
1. Both section 29.23(k)-6 of Regulations 111, applicable to the year 1951, and section 39.23(k)-6 of Regulations 118, applicable to the year 1952, provide that: In the case of a taxpayer, other than a corporation, if a nonbusiness bad debt becomes entirely worthless * * * the loss resulting therefrom shall be treated as a loss from the sale or exchange of a capital asset held for not more than six months.↩