Clayton R. Janssen and Florence E. Janssen v. Commissioner. Rae F. Helmke and Jean D. Helmke v. Commissioner.
Janssen v. Commissioner
Docket Nos. 47254, 47284.
United States Tax Court
T.C. Memo 1955-192; 1955 Tax Ct. Memo LEXIS 146; 14 T.C.M. (CCH) 767; T.C.M. (RIA) 55192; July 8, 1955
*146 Certain advances made by petitioners to Rosario Syndicate held to be loans, and losses from the worthlessness of such loans are properly deductible as nonbusiness bad debts. Section 23(k)(4), Internal Revenue Code of 1939. Henry W. Howard, Esq., Balfour Building, San Francisco, Calif., for the petitioners. Wayne Prim, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioners for years and in amounts, as follows: Docket No. 47254
Year
Deficiency
Clayton R. Janssen and
Florence E. Janssen
1949
$ 2,245.82
Docket No. 47284
Rae F. Helmke and Jean
D. Helmke
1948
$ 729.58
1949
819.12
The issues common to both proceedings are whether certain advances made by petitioners to Rosario *147 Syndicate constitute contributions to capital or bona fide loans; if the latter, whether the losses resulting therefrom were business or non-business bad debts; and whether petitioners' distributive share of a loss sustained by the partnership of Helmke, Thomas & Janssen, resulting from advances made to Rosario Syndicate constitutes an ordinary or capital loss. An additional loss question is raised in Docket No. 47284 involving the payment by Helmke of $ 2,000 to Clayton R. Janssen in fulfillment of his guarantee of an obligation incurred by Rosario Syndicate. Further issues framed by the pleadings have been settled by mutual concessions. Findings of Fact The stipulation of certain facts filed by the parties, with exhibits attached, is incorporated herein by this reference. The petitioners in Docket No. 47254 are Clayton R. Janssen and his wife, Florence E. Janssen, who filed their joint income tax return for the year involved with the collector of internal revenue for the first disstrict of California at San Francisco. The petitioners in Docket No. 47284 are Rae F. Helmke and Jean D. Helmke, husband and wife, who also filed joint income tax returns for the taxable years involved *148 with the collector of internal revenue for the first district of California. Rosario Syndicate (hereinafter sometimes referred to as the Syndicate) was an unincorporated association organized under the law of the State of California on May 1, 1946, for the purpose of providing funds for the operation of a Mexican corporation known as Minas de Sura de Sinaloa S. A. (hereinafter sometimes referred to as Minas). Minas held the mining rights to Mexican silver properties near the town of Rosario, Mexico, known as the San Francisco, Los Angelo and Purissima claims. It was organized originally by a California mining firm known as Tyson Chrome Mines (hereinafter referred to as Tyson), a limited copartnership in which Benjamin C. Mickle was the general partner and Edith O. Ekstrom and F. T. Grogan were the limited partners. Tyson was first interested in the prospects of these properties by Roger Beals, a geologist in their employ. Beals made an extensive survey of the claims in 1943, and, upon the basis of his favorable report, Tyson organized the Mexican corporation and advanced to it about $ 33,000 for prospecting purposes. In the spring of 1945, it was decided that funds should be raised *149 to finance the construction of a mill and carry on the mining operation until it became self-sustaining. In May, 1945, the Syndicate was organized and the issuance of certificates evidencing a subscription to its capital in the amount of $ 100,000 was authorized. Such capital amount was computed by the original organizers as a figure which would be sufficient to cover the installation of a 50 ton mill on the property in Mexico and to provide the Mexican corporation with sufficient operating capital to place the venture on a self-sustaining basis. Of the 200 shares offered for sale by the Syndicate at $ 500 per share, 167 were immediately subscribed on May 1, 1945. By February 5, 1946, the balance of the offering had been subscribed. There were ultimately 24 subscribers to the shares of the Syndicate and the largest number held by any one person was 26, held by Helmke. Janssen held 21 shares. Intensive development work on the property, including the purchase and installment of machinery, was immediately commenced, and in the spring of 1946, the mill was completed. The mine produced small quantities of ore which yielded gold and some zinc and lead. The gold was sold to the Mexican *150 government which maintained a gold monopoly while the other ore was going into the tale pond at the mine. Discussions were then being had with the American Smelting and Refining Company with the view to selling thereto the lead and zinc production. During the spring of 1946 it became apparent that substantial additional funds would be required to carry out the project, the cash resources of the enterprise having approached the exhaustion point, and efforts were made to raise funds from existing shareholders and other persons. The additional financing thus raised included funds acquired from certain shareholders, the capital investments of whom in the Syndicate and the amounts advanced by whom during the years 1946, 1947 and 1948 were as follows: Amount
Share
Advanced to
Name
Investment
the Syndicate
C. R. Janssen
$ 10,500
$ 24,000.00
Rae F. Helmke
13,000
6,365.05
B. C. Mickle
11,500
15,984.59
F. J. Grogan [1] *151 11,000
10,500.00
H. C. Warren
12,500
16,500.00
The advances made to the Syndicate were at first set up in an account maintained in the general ledger of the Syndicate entitled "Advances" and treated as advances with moneys loaned that were of the so-called temporary nature. Subsequently, as the volume increased and the problem of security came into the picture, these advances came to be treated as long-term loans to be paid off at some future time, and were transferred out of the "Advances" account to a newly set up account entitled "Loans (Secured by Mortgage) Control Account." As the volume of advances made by him and Mendo increased, Janssen felt the need of security by way of a chattel mortgage. Discussions among those who had made advances to the Syndicate developed a feeling that Janssen should not be the only one to be so secured. Subsequently, Janssen agreed that others would be included in the security afforded by a chattel mortgage. In 1947, such mortgage was drawn and sent to a Mexican attorney for the purpose of having the same filed for record. Due to certain legal difficulties, such recordation was *152 never accomplished despite the efforts of Helmke and Janssen to that end. Upon representations of certain tax refunds due, Janssen made further advances against the promised assignment of such refunds. Neither the refunds nor the assignment thereof was ever forthcoming. The last advance made by Janssen in the sum of $ 10,000 was made upon a guarantee for its repayment by Mickle, Helmke and three other shareholders, each of whom guaranteed repayment of the advances to the extent of $ 2,000. Subsequently, each of the guarantors was called upon and did perform fully upon his guarantee to Janssen, who was reimbursed in full for the $ 10,000. The repayment by Helmke was made by check dated February 16, 1949, in the amount of $ 2,500 which was inclusive of interest and a sum owed Janssen for travel expenses incurred by Helmke on a trip from Mexico. The Articles of Agreement of the Syndicate provided, in part, as follows: "The general purpose of the Syndicate is to provide a pool or fund to be loaned a Mexican corporation hereinafter referred to as The Company in order to enable such corporation (a) to equip the mining properties of Minas del Sur de Sinaloa, S.A., above mentioned, with *153 adequate mining machinery, (b) to purchase milling machinery, supplies and equipment for said properties, (c) to transport and install the same, and (d) to continue operations until the venture becomes self-sustaining. * * *
"It is agreed that the Syndicate shall provide, for the purposes aforesaid, the sum of approximately $ 100,000.00 of which $ 50,000.00 is to be immediately subscribed and the sum so provided and any additions thereto, shall constitute the capital of the Syndicate. Said sum is to be expended in any manner deemed proper and within the scope of the Syndicate purposes by the Managers. * * *
"As funds advanced to the Company by the Managers from the capital of this Syndicate are repaid, the Managers shall distribute the same among the parties hereto, and each subscriber shall share pro-rata in the distribution allotted to all the subscribers in the proportion that the number of shares owned by him bears to the total number of shares then outstanding." * * *
The Articles of Agreement of the Syndicate further provided that the Syndicate was to continue for as long a period as it appeared profitable to do so unless prior thereto a corporation was formed *154 to take over the affairs of the Syndicate pursuant to a recommendation of the managers and upon agreement of the subscribers owning two-thirds of the shares outstanding. In January of 1947, the managers of the Syndicate proposed to the shareholders and those who advanced additional funds a reorganization which contemplated the formation of a new corporation to be known as the Argentite Corporation (hereinafter called Argentite). Argentite was, in fact, incorporated under the laws of the State of California on January 18, 1947, with an authorized capital stock of $ 500,000. Under date of January 20, 1947, the managers of the Syndicate addressed a formal offer embracing the plan to its shareholders and others interested. In essence, the offer provided that the capital stock of Argentite would be exchanged at par for the certificate holders' interest of $ 100,000 and for the advances of $ 120,028.39 which had been made. On October 31, 1945, the balances in the Syndicate's bank account and entries subsequent thereto were as follows: Date
Charges
Credits
Balance
Oct. 31, 1945
$ 45,355.43
$ 39,343.42
Nov. 30, 1945
2,442.23
8,405.69
Dec. 31, 1945
15,000.00
12,284.21
Jan. 31, 1946
7,600.00
10,833.61
$ 70,397.66
$ 70,866.93
70,397.66
Balance
Jan. 31, 1946
$ 469.27
*155 Although some ore was produced, the operation never became a productive and self-sustaining venture. In 1948 the milling machine and equipment were sold for $ 20,000 and the mill was abandoned. The purchase price was payable under the terms of a promissory note, which was collected in full, together with interest in the amount of $ 655.21, and all of which was disbursed as follows: Reimbursement
for
Advances
Made to
Partial
Satisfy
Payment
Total
Syndicate's
on Advances
Recovered
Name of
Current
Made
and
Payee
Obligations
to Syndicate
Disbursed
Janssen
$ 1,731.22
$ 11,480.92
Ekstrom
2,831.01
1,550.00
Helmke
567.04
50.00
Others
1,587.65
850.00
$ 6,716.92
$ 13,930.92
$ 20,647.84
Cash on hand
7.37
$ 20,655.21
Face Amount of Note
$ 20,000.00
Interest Received
655.21
Total Received
$ 20,655.21
Petitioner, Rae F. Helmke, is a graduate of Stanford University at Palo Alto, California, in Mineral Science and Geology, primarily geology. He has engaged in many phases of the mining business, including exploration, engineering, development work, ore buying and selling and mine operation. At the time the *156 Syndicate was formed, Helmke was a member of the firm of Helmke, Thomas & Janssen which was a co-partnership organized in 1942 and engaged in the business of exploration, development and operation of various mineral properties, particularly in Northern California. The total gross receipts from the partnership activities in the year 1947 was $ 4,494.55. It incurred a net loss of $ 1,539.06 in such year and suspended operations in November, 1947. During the period the partnership operated, Ekstrom of Bradley & Ekstrom loaned the venture money with which to meet its payroll and handled the sale of new ore production. After acting in the capacity of operator and geologist on various mining operations from about 1941, Helmke, in 1945, entered the employment of Bradley & Ekstrom, a San Francisco mining firm which had been continuously engaged in the business of buying and selling mineral ores and the exploitation of mineral properties since 1924. He acted as a mining engineer and ore buyer. Since the incorporation of that corporation in 1950, he has been its vice president and manager. Helmke had, from time to time, been employed as a mining engineer by Tyson, which was engaged in the operation *157 of chrome mining properties in Northern California. During this period and prior thereto Helmke was also engaged, in association primarily with Janssen and Thomas, in exploration for chrome mining properties in Northern California. During the years 1946 through 1949 he participated in approximately ten such ventures, chiefly as an employee of Bradley & Ekstrom. Other activities from which he received compensation during the period from 1945 through 1949, were for professional services rendered, as follows: Received from
Year
Amount
Commission from G. S. Towne
Mt T. Inc.
1945
$ 1,000.00
Engineering work from Tyson
Mine
1946
642.33
Analysis for Treasury Dept.
Lands Division - Net
1948
1,357.92
Total for five years -
1945 through 1949
$3,000.25
He also reported income or loss from the partnership of Helmke, Thomas & Janssen, as follows: Year
Amount
1947
$ 441.20
1948
( 577.15)
1949
(1,068.78)
Total Net Loss Claimed (during
five years, 1945 through 1949)
[1,204.73)
Salaries received by Helmke from Bradley & Ekstrom were as follows: Year
Amount
1945
$ 3,150.00
1946
4,000.00
1947
3,850.00
1948
8,170.48
1949
11,239.04
Total received - 1945 through
1949
$ 30,409.52
*158 Mickle, the manager of Tyson, had heard about Helmke's activities through Bradley & Ekstrom, and in 1943, he contacted Helmke while the latter was engaged in operations in Humboldt County, California, and discussed with him a specimen of very high grade gold, silver, lead and zinc ore. He explained that Tyson was interested in developing Mexican property and desired Helmke's financial and technical assistance. Helmke replied that he would be unable to help financially to any great extent and referred him to petitioner Janssen who had previously furnished financing to Helmke's projects. Helmke agreed to participate in the venture as a technician. To this end he went to Mexico in 1945 at the request of the owners of Tyson, including Bradley & Ekstrom, who regularly employed him as consulting engineer, with the idea in mind that Janssen and others might participate in the venture. Helmke was impressed with the possibilities of the property and as a result subscribed, on behalf of himself and his wife, to 26 shares of the capital stock of the Syndicate. He made further trips to the mine in August, 1946, November, 1946, and February, 1947. During the period he also represented the firm *159 of Bradley & Ekstrom in its capacity as purchasing agent for the Syndicate, in which capacity it supervised the purchase and shipment of substantial items needed in the venture and for which it received its usual percentage fee as compensation. It was also understood that Bradley & Ekstrom would act as the broker for the sale of all lead and zinc production of the mine. In 1945, when Helmke entered the employment of Bradley & Ekstrom, there were outstanding loans due it from Tyson in the amount of $ 23,000. Helmke was designated to explore the properties with a view toward further production sufficient to repay the indebtedness. Production proved profitable and the entire indebtedness was repaid. Petitioner Janssen has been engaged in the construction business in the city of San Francisco for many years. He has operated largely through Mendo, which was engaged primarily in the construction of homes and apartment buildings, and in which he owned 99.92 per cent of the stock. Mendo was engaged in the business of financing real estate and property rentals and management. Janssen was the president and during 1947 and 1948 devoted his entire time to the business thereof. During the war *160 years restrictions on building curtailed the corporation's activities in this field. After the war Mendo again engaged in construction activities and among other things completed the construction of two apartment buildings in 1947 and 12 homes in 1948. In each of the years 1946 through 1949, Janssen received a salary from the corporation ranging from $ 10,400 to $ 20,000 per year. As per his tax returns, the salary so received constituted his sole livelihood excepting certain amounts received from rentals and securities, certain capital gains realized in 1946, and a contract fee received in 1949. No income was reported from any other business or mining venture during such years. Janssen's experience has been limited chiefly to building and building financing. Janssen established his relationship with Helmke in 1941 at which time the latter was operating various mining properties in Humboldt, Mendocino and Trinity counties in California. At the outset it was purely a financial relationship, Janssen furnishing the funds to Helmke from time to time to facilitate the development and operation of mines. Out of this relationship developed the partnership of Helmke, Tyson and Janssen, which *161 was formalized in an agreement of July 10, 1942. Later Janssen took a more active part and actually visited and examined the mining properties in which they were mutually interested. During the years 1942, 1943, and 1944, he advanced sums to the partnership in the amounts of $ 3,000, $ 1,000 and $ 2,000, respectively. Helmke, Tyson and Janssen entered into an arrangement with Bradley & Helmke for the disposition by the latter of ore produced by the former after 1945. Janssen received no income from any of the partnership ventures from 1945 through 1949. On May 1, 1945, Janssen personally invested $ 10,500 in the Syndicate's initial subscription of $ 100,000. As the Syndicate required more funds he responded by advancing amounts which, by January 27, 1947, totaled $ 13,250. Up to this point, Janssen had not taken an active part in the activities of the venture and was not an officer in the Association. As the amount of his loans increased, be began to be more active in its operations. By early 1947, reports on the mine indicated that it was running into difficulties and Janssen decided to make his first trip to the mining site. The trip was made in February, 1947, and while there he inspected *162 the operations and assisted H. L. Pomeroy, an accountant who accompanied him, in attempting to set up a proper system of bookkeeping. Janssen's trip to Mexico revealed that the Syndicate owed money in Mexico and since his advancements had by that time reached sizable proportions, he became apprehensive as to making any further. He first requested the execution of the aforementioned chattel mortgage. The management was advised by its Mexican attorney that it would not be possible to supersede the Mexican claims. Not being protected with a chattel mortgage nor the promised assignment of the tax refund claims as security, Janssen demanded a guarantee be made by five of the principal shareholders for any further advances. As above noted, this was agreed to and the last $ 10,000 of the $ 24,000 advanced by Janssen was so guaranteed. In September and October, 1946, the partnership of Helmke, Tyson and Janssen made advancements to the Syndicate in a total amount of $ 2,850. This was the first loan that the partnership had ever made to a mining venture and in past operations was usually required to borrow funds. Helmke and Janssen each had a 37 1/2 per cent interest in the partnership. The *163 partnership was inactive during its fiscal year ended May 31, 1949, but it claimed a loss from the worthlessness of an advance to the Syndicate and in its return it reported the loss as a long term capital loss to be distributed among the partners. The return was signed by Helmke and H. L. Pomeroy, the latter of whom was the accountant for both the partnership and the Syndicate. The advances made by petitioners to Rosario were bona fide loans and not contributions to capital. Opinion VAN FOSSAN, Judge: There is no controversy here with respect to the amounts of the advances made to the Syndicate by the petitioners. Nor do the litigants disagree as to the year in which each individual petitioner respectively sustained his loss therefrom. Respondent concedes that petitioners each suffered a loss in the year claimed but contends that it was a capital loss and that the allowable deduction, therefore, is limited in accordance with the applicable statutory provisions. The primary dispute involves the legal status of such advances, that is to say, whether they were loans as contended by petitioners or contributions to the capital of the Syndicate as determined by respondent. The issue *164 thus framed is one of fact and the objective intent of the parties concerned, as established by all the relevant facts of record, is decisive. Erard A. Matthiessen, 16 T.C. 781, affd. 194 Fed. (2d) 659. Brinker v. United States, 116 Fed. Supp. 294. As was stated in Edward Katzinger Co., 44 B.T.A. 533, at page 536: "* * * Funds advanced by shareholders to their corporation may or may not be contributions of capital, augmenting the cost of the shares, depending upon the circumstances under which the advancements are made. Advances are an additional contribution of capital if they are intended to enlarge the stock investment, but not if they are intended as a loan. * * *" There is no conflict between the cases cited by petitioners and those cited by respondent. All authorities agree that the formal characterization of the advances as loans by the parties involved and even as evidenced by book entries, while relevant factors, are not to be allowed to obscure the substance of the transaction. Isidor Dobkin, 15 T.C. 31, affd. 192 Fed. (2d) 392; Powers Photo Engraving Co., Inc., 17T.C. 393, remanded on another *165 ground, 197 Fed. (2d) 704. This case is not another of the so-called thin capitalization cases. Here the record affirmatively shows that the initial capitalization of the Syndicate was computed by the original organizers thereof in accordance with an accepted formula thought to be sufficient to install a 50 ton mill, furnish operating capital for the development of the mine, and operation of the mill until it was on a self-sustaining basis. When such amount proved to be inadequate the advances in controversy were made. Albeit the intent of the parties in making the advances is best known to them, and their testimony, unless discredited, is entitled to much weight, we should look to all the evidence to ascertain the fact of intent. Here the testimony of the parties is categorical. Both Helmke and Janssen testified that the advances were loans. Their position was not weakened by cross-examination. Corroborative of this testimony is the fact that eight persons who were not shareholders joined with Helmke and Janssen in making advances. As to these persons there can be no question. They had no stock or other interest in the projects and their advances were undeniably loans. *166 Also corroborative, though not conclusive, are the treatment of the advances on the books and the fact that the advances by Helmke and Janssen were not in proportion to their stockholdings. Strongly corroborative of petitioners' position is the fact that the attempt to perfect and file a chattel mortgage securing the advances failed only because of a complication of Mexican law. Perhaps the strongest support for petitioners is in the requirement by Janssen that five other persons, including Helmke, guarantee the repayment of the last $ 10,000 advanced by him, which guarantee was subsequently enforced and Janssen was made whole as to the $ 10,000 advanced. Standing over against the above facts are the facts that no maturity date for repayment of the advances was specified, nor were any notes issued nor any provision made for the payment of interest. Studying all these facts carefully and looking at the several transactions in the frame of the whole record, we are fully convinced that both Helmke and Janssen intended the advances to be loans. We have held them to be such in our findings. The next question involves the proper tax treatment to be accorded the losses sustained by Helmke *167 and Janssen from the worthlessness of the foregoing debts. There is no dispute as to the fact of worthlessness nor as to the time when the debts became worthless. That is to say, the parties agree that the Syndicate's debt as to Helmke became worthless in 1948 and as to Janssen, in 1949. [3]
Petitioners contend that the debts in question were business debts, and argue that, as such, their consequent losses are deductible in full. Respondent maintains that such debts were non-business debts, the losses from the worthlessness of which are deductible under section 23(k)(4) of the Code of 1939, subject to capital loss limitations. [4]
*168 To prevail, petitioners must establish that the debts in question and the losses from the worthlessness thereof bore a direct and proximate relation to a trade or business conducted by Helmke and Janssen at the time such debts became respectively worthless. Jan G. J. Boissevain, 17 T.C. 325. Robert Cluett, 3rd, 8 T.C. 1178. H. Rept. No. 2333, 77th Cong., 2nd Sess., p. 77. See also Regulations 111, section 29.23(k)(6). In this connection, it has long been settled law that a trade or business carried on by a corporation, or an unincorporated entity, is not that of the individual officers and/or shareholders thereof. Burnet v. Clark, 287 U.S. 410; Dalton v. Bowers, 287 U.S. 404. Petitioners recognize the foregoing legal concepts and argue that they were each in the business of lending money to mining enterprises at the time the loans were made, as well as at the time the debts became worthless. In support of the argument thus advanced by them, petitioners cite and rely principally upon such cases as Robert Cluett, 3rd, supra; Vincent C. Campbell, 11 T.C. 510; Henry E. Sage, 15 T.C. 299; Weldon D. Smith, 17 T.C. 135, *169 reversed 203 Fed. (2d) 310. These cases, however, are clearly distinguishable on their respective facts. Likewise, other cases cited by petitioners are distinguishable and of no controlling authority. As was said in Jan G. J. Boissevain, supra, with respect to the Campbell, Sage, and Smith cases: "* * * The basis of the decisions in those cases, * * * was that in each case the evidence led this Court to conclude that each of the taxpayers 'was engaged in a number of business ventures, not only giving financial assistance, but also personally participating in the various enterprises' so that the loans to the corporations involved were held to be part of the regular business of each taxpayer. * * *." and in Charles G. Berwind, 20 T.C. 808: "* * * The authority contained in such cases * * * is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves. * * *" In the Cluett case, the debt there involved *170 represented the partial purchase price of a fractional accretion to a Stock Exchange seat sold by the taxpayer in 1929, the use of which seat was available to the taxpayer alone and was one of the principal tools of his business. It was there held that the debt arose in connection with the taxpayer's business, "* * * which involved owning the Exchange membership, which, in turn, required a sale of the accretion in order to realize any benefit therefrom. * * *". Such is not the case here. No showing is here made that the Syndicate was a vital tool in any business regularly carried on personally by Helmke or Janssen nor that the loans in dispute were necessary to the preservation and protection of such a business. That record is devoid of evidence showing that Helmke and Janssen were, at any time here material, engaged in the business of making loans to mining enterprises as contended by them. The only specific or identifiable loans so made by them in the here pertinent years, of which we know, were made to the Syndicate. Such loans were made in an unsuccessful attempt to further the development of the mine with the hope of getting it on a paying basis. The evidence shows that over *171 a period of years prior to 1949, Janssen had financed various mining operations in which Helmke was involved, and was a member of a mining partnership of which Helmke was a member. Evidence with respect to Janssen's activities in such prior years is material, however, only in so far as it tends to show the nature of the business engaged in by him in 1949. Jan G. J. Boissevain, supra.Further, this evidence, when considered together with that bearing upon the year 1949, does not show that Janssen's financing activities ever became so extensive as to constitute a business in and of itself. The facts with respect to Helmke are even less favorable and in the aggregate fail to show that he was, in 1948, engaged in any business of which his loans to the Syndicate were a part. A. Kingsley Ferguson, 16 T.C. 1248. Charles G. Berwind, supra.We conclude, therefore, that the loans involved are properly deductible as non-business bad debts under section 23(k)(4). With respect to the advance of $ 10,000 by Janssen, on account of which Helmke was required to pay $ 2,000 by reason of his guarantee, respondent now concedes (by letter to the Court dated May 9, 1955) *172 that such loss of $ 2,000 sustained by Helmke "should be allowed in 1949 in full as an ordinary loss deduction", this concession being "contrary to the position" theretofore taken by respondent in his brief. With regard to the advancements made to the Syndicate in 1946, by the partnership of Helmke, Thomas and Janssen in the amount of $ 2,850, respondent has disallowed petitioners' respective distributive shares of the loss occasioned thereby in their entirety, holding that the debt became worthless in 1950. In view of the stipulations and concessions by counsel as to other issues in the case and our holding thereon, we are of the opinion that this item of loss should be allowed in 1949, as claimed by the petitioner. We so hold. Decisions will be entered under Rule 50. Footnotes
1. This name appears in the stipulation both as F. J. $ 10,000 was guaranteed by Helmke and four other shareholders. In addition, Janssen's wholly owned corporation, the Mendo Corporation (hereinafter referred to as Mendo) advanced an aggregate of $ 36,563.24 to the Syndicate in the years 1946 through 1949; the sum of $ 23,000 was advanced by the following persons, none of whom were shareholders of the Syndicate: Name
Amount
R. H. Macfarlan
$ 1,000.00
E. N. Middleton
1,000.00
F. G. Montgomery
1,000.00
M. Kocel
1,000.00
H. F. Mandich
1,000.00
W. W. Owen
1,000.00
H. G. Perelmutter
1,000.00
Edith O. Ekstrom n.2 16,000.00 n.2 Mrs. Ekstrom had previously purchased 10 shares of the stock of Syndicate for her sister, Mary A. Bradley.
3. This seeming inconsistency is not explained in the evidence nor on brief.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "nonbusiness debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩