Estate of William Deering Howe, Deceased, Elizabeth S. Rutherfurd and Chemical Corn Exchange Bank (formerly Chemical Bank & Trust Company), Executors, and Elizabeth S. Rutherfurd (formerly Howe) v. Commissioner.
Estate of Howe v. Commissioner
Docket No. 52141.
United States Tax Court
T.C. Memo 1957-58; 1957 Tax Ct. Memo LEXIS 196; 16 T.C.M. (CCH) 246; T.C.M. (RIA) 57058; March 29, 1957
Paul R. Russell, Esq., and Halsey T. Tichenor, III, Esq., for the petitioners. Ellyne E. Strickland, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax against the petitioners for the year 1948 in the amount of $402,175.60. The petitioners are the duly qualified and acting executors of the estate of William Deering Howe, deceased, and his surviving spouse. A joint return was filed by them for the year 1948 which covered the income and deductions of the decedent up to and including the date of his death, *197 November 7, 1948, and the income and deductions of his wife for the entire year 1948. The questions presented in this proceeding are: (1) Whether the petitioners are entitled to a deduction of $927,603.66 which they are claiming for business bad debts owing to the decedent and which allegedly became worthless or partially worthless in the period from January 1, 1948, to November 7, 1948. (2) Whether the petitioners are entitled to a deduction of $872,203.10 on account of the decedent's investments in the capital stock of two corporations which allegedly became worthless in the period from January 1, 1948, to November 7, 1948. (3) Alternatively, whether the petitioners are entitled to the deductions claimed on the theory that the sums represent losses incurred in trade or business or losses incurred in transactions entered into for profit, under the provisions of section 23(e) of the Internal Revenue Code of 1939. Findings of Fact The parties have filed herein a stipulation of many of the evidentiary facts. We find these facts to be as stipulated and incorporate by this reference the stipulation and the voluminous exhibits attached thereto. The petitioners, Elizabeth S. *198 Rutherfurd and Chemical Corn Exchange Bank, are the duly qualified and acting executors of the estate of William Deering Howe, deceased, and petitioner, Elizabeth S. Rutherfurd (formerly Elizabeth S. Howe), is also the decedent's widow. A joint Federal income tax return for 1948 was filed with the collector of internal revenue for the first district of New York by Elizabeth S. Howe (now Rutherfurd), the surviving spouse, and the executors of the decedent's estate. This return showed no income tax liability and claimed a refund in the amount of $418,236.03 representing payments made pursuant to the 1948 declaration of estimated tax. This amount was refunded. For the year 1948, payments of estimated tax were made by the decedent and Elizabeth S. Howe (now Rutherfurd) as follows: Elizabeth S. Howe
March 15, 1948
$30,781.15
June 15, 1948
30,781.15
September 14, 1948
30,781.15
January 13, 1949
97,681.38
$190,024.82 [1]
Amount brought forward
$190,024.82
William Deering Howe
March 11, 1948
$75,000.00
June 11, 1948
75,000.00
September 13, 1948
75,000.00
1947 credit
3,211.21
228,211.21
$418,236.03
*199 Separate returns were filed by decedent and his wife for the years 1945, 1946, and 1947. The decedent was born on May 16, 1900, in Chicago, Illinois, and obtained his Bachelor of Law's degree from Harvard Law School in 1925. He was admitted to the Bar of the State of New York in 1926 and was first associated with the law firm of Shearman & Sterling on January 4, 1926. He was an extremely wealthy man, having inherited a great deal of wealth from his mother and uncles. In addition to and apart from his law office, he maintained an office where his personal financial affairs and investments were managed. He became a partner of Shearman & Sterling on January 1, 1931, and practiced law in that capacity until January 1, 1942, when he took a leave of absence to accept a commission as a Major in the U.S. Army Air Corps. He resigned from Shearman & Sterling on July 24, 1942, and did not thereafter reenter that firm. In the Air Corps decedent was engaged in contract negotiation duty and came into contact with representatives of many companies engaged in aviation supply, including the manufacturers of planes for both commercial and military use. During this period of service he became interested *200 in the possibilities of commercial aviation, particularly nonscheduled charter airline service. On his release from military service in 1945, he developed and organized a nonscheduled charter airline service which he financed entirely with his own funds. As a veteran, petitioner had certain rights to purchase surplus planes and, pursuant to these rights, he purchased several surplus planes known as DC-3's which had been used for the transportation of cargo and which were converted by petitioner to passenger planes. This business was operated by petitioner as a sole proprietorship in cooperation with his friend and associate, Hugh Fenwick, under the name of Transair until February 20, 1946. During this initial period the business was successful and its operation resulted in a profit. Decedent caused Transair to be incorporated under the laws of the State of New York on September 28, 1945, for the purpose of engaging in the air transport business by operating a nonscheduled charter service. On February 20, 1946, the directors of Transair (hereinafter referred to as Transair) accepted the decedent's offer to transfer to that company the assets of the business theretofore carried on *201 by the decedent as a sole proprietor in exchange for 1,079 shares of its $100 par value common stock. The aggregate par value of the stock, $107,900, represented the amount of the cash invested by the decedent in the business to that date. Decedent continued to furnish financial support to the business after its incorporation both by additional investments in stock during 1946 and by frequent loans or advances. By the end of 1946 the decedent had invested in Transair a total of $772,203, for which he had received 7,725 shares of Transair stock. Of such shares, 275 shares were transferred by the decedent to two individuals without consideration, which shares were later surrendered to the decedent's executors. The only shares of Transair issued to persons other than the decedent were 500 shares which were issued to Hugh Fenwick for $50,000 cash. Decedent, in order to secure the services of Fenwick for his air transport activities, loaned Fenwick $50,000 with which the latter purchased the 500 shares, and decedent took a note for the amount of the loan, secured by the shares as collateral. This note was never paid and the shares thus purchased by Fenwick were later surrendered to *202 the decedent's estate. After 1946, the decedent made no further investments in the stock of Transair, but he continued to assist the company by numerous advances on open account for some of which he later received the company's notes. In addition, he loaned Transair money against the company's notes. Thus, at his death, decedent owned interest-bearing notes of Transair totaling $536,705.58, and had advanced to Transair an additional $119,546.80 on open account, all of which represented loans made by the decedent, no part of which had been satisfied and with respect to which no interest had been paid as of the time of his death. In addition, at the time of his death, decedent owned stock of Transair for which he had paid $772,203 and with respect to which no distributions had been or ever have been made. Of the amount of notes of Transair, aggregating $536,705.58, held by the decedent, only $336,705.58 was deducted in the 1948 joint return as a wholly or partially worthless debt. This resulted from the exclusion of an estimated maximum recovery of $200,000. Decedent's advances to Transair, aggregating $119,546.80, were deducted in full in the 1948 joint return. The decedent's books *203 of account show entries reflecting the charge-off, as of November 6, 1948, of the above debts in the amounts of $336,705.58 and $112,046.80 claimed to be wholly or partially worthless. Upon final liquidation of Transair, the actual recovery with respect to all holdings of the decedent therein was approximately $163,000. Included among the notes totaling $536,705.58 which Transair owed to decedent at the time of his death was one for $160,000 given under date of April 15, 1948, maturing on April 14, 1949, and bearing 4 per cent interest. This note was given in consideration of a cash loan of that amount made to enable Transair to satisfy obligations in the amount of $160,000 to the Chemical Bank & Trust Company, which obligations had been guaranteed by the decedent and bore interest at 3 per cent. At all times after the transfer of assets of decedent's sole proprietorship to Transair, decedent was the chief executive officer, serving both as chairman of the board of directors and as president. Decedent was primarily concerned with top-level executive responsibilities including the financial and legal problems of Transair, while Fenwick was primarily concerned with operational problems. *204 However, in the early stages of Transair's business while it was actively engaged in operating nonscheduled flights, decedent as an officer of Transair was also active in matters relating to operations such as the employment of personnel and the obtaining of airport space and offices. Accordingly, during this period he worked for exceedingly long hours. At all times during the periods here involved, he devoted his working time to the business of Transair and the two other corporations hereinafter described. No compensation was authorized or paid by Transair for these services. The operations of Transair for the period from February 20, 1946, to December 31, 1946, resulted in a net loss and deficit of $441,210.95. Its balance sheet as of December 31, 1946, indicated that its assets exceeded its liabilities (exclusive of stock) by $391,190.18. For the year ended December 31, 1947, Transair had a net loss of $606,005.17, making a total deficit of $1,047,216.12 at the end of the period. For the 3 months ended March 31, 1948, Transair had a net loss of $106,705.45, making a total deficit at the end of the period of $1,153,921.57. Its balance sheet as of March 31, 1948, indicated that *205 its liabilities (exclusive of stock) exceeded its assets by $121,520.44. For the 7-month period ended October 31, 1948, Transair had a net loss of $121,037.68, making a total deficit at the end of that period of $1,274,959.25. Its balance sheet as of October 31, 1948, indicated that its liabilities (exclusive of stock) exceeded its assets by $442,558.12. Promptly after decedent's death on November 7, 1948, his executors decided to liquidate the business and formal action authorizing the liquidation of the company was taken by the corporate directors at a meeting on November 29, 1948. For the 5 months ended March 31, 1949, the company sustained a net loss of $74,462.54; the deficit at the end of the period amounted to $1,349,421.79. The deficit had increased to $1,369,847.59 on May 31, 1950. Closely related to the Transair operation was one involving Aero Industries Corporation (Aero). During 1946 the maintenance facilities at Newark Airport proved inadequate for Transair and the cost of such work by outsiders became prohibitive. It was learned that Aero, a Delaware corporation doing business in New Haven, Connecticut, had a maintenance shop, licensed as such by the Civil Aeronautics *206 Board, with adequate staff and other facilities for the conversion of surplus planes, but that it had insufficient business. The decedent indicated his willingness to finance the acquisition of the New Haven facilities to the extent that Transair might be unable to do so. Transair acquired 75 per cent of the Aero stock on September 19, 1946, in consideration of the assumption of all of Aero's liabilities and the responsibilities of future management and financing. For a short period after such acquisition, the necessary funds for Aero operation were supplied directly by Transair out of funds received from the decedent, but beginning in October 1946 and continuing approximately to the date of his death the decedent supplied the needed financial assistance by loans and advances made directly to Aero. Up to the time of his death decedent had received and owned interest-bearing notes of Aero in the aggregate amount of $244,716.46, representing loans made by decedent to Aero which had not been paid; he had made advances to Aero not represented by notes aggregating $42,259.24. None of the above loans and advances had been repaid and no interest thereon had been paid. Of the amount of notes *207 of Aero held by decedent only $234,716.46 was deducted in the 1948 joint return as a wholly or partially worthless debt. This resulted from the exclusion of $10,000 representing the nominal amount estimated as the outside maximum recovery. Decedent's advances to Aero were deducted in full in the 1948 joint return. The decedent's books of account show entries as of November 6, 1948, reflecting the charge-off of the amounts of the above debts claimed to be wholly or partially worthless. No amounts were ever recovered by decedent's estate with respect to these debts. The liquidation of Aero was completed on June 15, 1949. Aero was organized under the laws of Delaware in August 1945. It carried on its operations at a loss with the result that there was a deficit of $28,923.73 on January 31, 1946. By March 31, 1947, the deficit, all of which resulted from operating losses, had increased to $391,171.73. Its balance sheet as of that date showed assets in the total amount of $315,804.35 and liabilities (exclusive of stock) in the total amount of $440,876.08. For the fiscal year ended March 31, 1948, Aero sustained an operating loss of $29,790.77 and the net loss for the year amounted to *208 $39,255.24; the total deficit at the end of the year was $430,426.97. Its balance sheet as of March 31, 1948, showed assets of $169,013.36 and liabilities (exclusive of stock) in the total amount of $333,340.33. For the 7 months ended October 31, 1948, Aero sustained a net loss from operations of $73,996.37 and the net loss for the period amounted to $110,373.20; the total deficit at the end of the period was $540,800.17. Its balance sheet as of October 31, 1948, showed assets of $112,517.82 and liabilities (exclusive of stock) in the total amount of $387,217.99. For the 5 months ended March 31, 1949, (during which Aero was in the process of liquidation) Aero sustained a further net loss from operations in the sum of $25,368.45 and the net loss for the period was $43,014.55; the total deficit on March 31, 1949, was $583,814.72. On June 15, 1949, immediately prior to its dissolution, Aero's deficit had increased to $577,680.52. Also, somewhat related to the Transair operation was a Cuban company, Expreso Aereo Interamericano, S.A., hereinafter referred to as Expreso. During 1946, Transair had acquired, reconditioned, and chartered a number of planes, of which four 23-passenger DC-3's *209 were not immediately required in the business. The decedent learned that Expreso had a charter for transportation by air between Miami and Havana, but did not have sufficient equipment. Late in 1946 the decedent arranged for the sale to Expreso of these four planes by Transair for interest-bearing notes payable to the latter corporation in the amount of $350,000. The decedent also purchased 100,000 Expreso shares with 100,000 warrants for $100,000. This represented approximately 10 per cent of the total outstanding shares of Expreso. The decedent became a director of the company and arranged for Fenwick, his associate, to go to Cuba in late 1946 to take charge of the Expreso operation. On May 3, 1948, the decedent resigned as a director of Expreso, because that company was not keeping financial records in accordance with the regulations of the Securities and Exchange Commission. The Expreso business was continued almost solely by means of advances made by the decedent from time to time until shortly before his death. Up to the time of the decedent's death he had personally loaned Expreso the sum of $190,200.58, for $100,407.58 of which he had received interest-bearing notes; the *210 remaining $89,793 represented the balance due on open account (an Expreso check to the decedent in the sum of $1,123 which had not been cashed prior to his death and was never paid is included therein). None of the above loans had been repaid at his death nor any interest thereon. Balance sheets and profit-and-loss statements reflecting the financial condition of Expreso show that that company sustained a net loss for 1947 of $630,806.53 and for 1948 of $464,533. Its balance sheet dated December 31, 1947, showed assets of $710,992.89 and liabilities of $1,013,249.89. Its tentative balance sheet dated April 30, 1948, showed assets of $373,157.84 and liabilities of $1,068,716.86. At the end of 1946 Transair curtailed the operation of its regular DC-3 passenger planes and sold four of them. As early as March or April of 1947 further resultant economies were made in connection with the operations of Transair, such as reducing its office staff and moving its offices to the decedent's personal office. Later in 1947 Transair acquired a surplus DC-4 plane. By the first of 1948 Transair had finished its conversion into a deluxe passenger plane, and chartered it to other lines for $15,000 *211 a month. This increased its income, but it continued to operate on a deficit. The decedent refused to consider suggestions that he take deductions on his 1947 income tax returns on account of his investments in or loans to the three corporations here involved, declaring that "the horse wasn't dead yet." In April of 1948, after the decedent was called upon to make good his guarantee of payment of $160,000 of Transair's bank obligations, he advised Fenwick that he was not going to advance any more money to any of the three companies except that which was absolutely required for their orderly operation pending their liquidation or the closing out of his financial interests in Expreso. On September 30, 1948, Sayer, the decedent's personal secretary, wrote him a memorandum concerning the dire financial plight of the three ventures, especially of Expreso. The decedent expressed his agreement with Sayer's memorandum and intimated that he would take steps to close out his financial interests in Expreso on his next trip to Havana. Shortly afterwards the decedent went to Havana where he died on November 7, 1948. In the latter part of 1948 and prior to November 7, neither decedent nor any other *212 officer of Transair or Expreso had the hope or expectation that the continuation of the business of these corporations would be profitable to its stockholders, and any such hope or expectation on their part at that time would have been unreasonable. After the decedent's death, on November 29, 1948, his executors and the officers of Transair and Aero decided to liquidate these companies, but their actual liquidation was not completed until later years, Aero in June 1949 and Transair in May 1950. Efforts by the executors of the estate after the decedent's death through the remainder of 1948 and early 1949 to collect anything from Expreso on account of decedent's claims against that company were fruitless. The executors were informed that there were numerous creditors, other than Transair and the decedent, with large claims against Expreso for oil and gas, maintenance, repairs, wages, and other operating costs, and that the company was hopelessly insolvent. However, early in 1949, a Cuban, Carlos M. Musso, approached the representatives of the estate indicating that he might pay $25,000 for the decedent's and Transair's claims against Expreso, together with decedent's Expreso stock *213 and warrants, if the Civil Aeronautics Board would renew and extend Expreso's foreign air carrier permit. Attempts by Expreso to obtain the renewal and extension of its foreign air carrier permit failed initially when the Civil Aeronautics Board in October 1950 concluded that Expreso had not shown its fitness and ability to conduct the proposed Havana-to-Miami service. (12 C.A.B. 292,297.) Nonetheless, the Civil Aeronautics Board granted Expreso the right to reopen the hearing to present further evidence of its fitness, willingness, and ability to perform foreign air transportation of persons, property, and mail between Havana and Miami. The hearing was reopened and the Civil Aeronautics Board in an order approved February 15, 1951, (12 C.A.B. 690) found that, because of the reorganization of Expreso, it had shown its fitness and ability to conduct the proposed service. The condition upon which Musso's offer was contingent having thus been fulfilled, on February 28, 1951, Transair transferred and assigned to the estate of the decedent its interest-bearing notes amounting to $350,000 and its accounts receivable from Expreso amounting to $65,124.38. These claims *214 which were added to the $190,200.58 of obligations theretofore owed to the estate of the decedent by Expreso, together with the stock and warrants of Expreso held by said estate, were transferred and assigned to the said Carlos M. Musso on March 1, 1951, for $25,000. Based on the relative amounts of debt obligations owned by the estate and Transair, immediately prior to February 28, 1951, $7,823.44 of the $25,000 received is allocable to the debt obligations owned by the estate and $17,176.56 is allocable to the obligations owned by Transair. In petitioners' joint return for 1948 a deduction of $927,603.66 was claimed on account of "business bad debts." This amount included the debts owed to decedent by Aero, Expreso, and Transair on notes and on loans and advances in the total sum of $923,428.66. The return also claimed deductions as long-term capital losses, the sum of $772,203 representing the worthless stock of Transair, and the sum of $100,000 representing the worthless securites of Expreso. The net long-term capital loss claimed in the return was $291,279.13. The respondent disallowed the deduction claimed on account of "business bad debts" for the reason that "it does not *215 appear that such debts became worthless during the taxable year nor did they constitute business debts within the contemplation of section 23(k) of the Internal Revenue Code." Respondent determined that petitioners had a net capital gain of $176,131.31 instead of the net capital loss reported in the return because of his holding that "the investment of $872,203.10 by you in the capital stock of Transair, Inc. and Expresso Aero Interamericano S.A. did not become worthless during the taxable year, * * *." The decedent was not engaged either in the separate trade or business of air transportation or in the trade or business of promoting, organizing, financing, and managing businesses during 1948. The stock of Transair and Expreso owned by decedent became worthless in the period January 1, 1948, to November 7, 1948. Opinion KERN, Judge: The principal issues for our decision here are whether the petitioners are entitled to deductions in 1948 under section 23(k)(1) of the Internal Revenue Code of 1939 for losses from business bad debts and under section 23(g)(2) for losses from worthless investments. Alternatively, the petitioners also raise the issue that all *216 of these losses are deductible from income under section 23(e) as losses incurred in the taxpayer's trade or business or in transactions entered into for profit though not connected with the taxpayer's trade or business. Under section 23(k)(1)[2] a deduction is allowed for "debts which become worthless within the taxable year" and which are approximately related to the taxpayer's business. Robert Cluett III, 8 T.C. 1178, Jan G. J. Boissevain, 17 T.C. 325. Section 23(g)(2)[3] allows a deduction for a capital loss "if any securities * * * become worthless during the taxable year and are capital assets * * *." *217 The petitioners' theory is that the decedent was engaged in an air transportation business and that the losses in question were proximately related to that business. The respondent argues that the decedent is not entitled to any deductions in this instance because loans or advances to a corporation by one of its stockholders generally cannot be considered a business debt, since the loss therefrom cannot be proximately related to the stockholder's trade or business. Burnet v. Clark, 287 U.S. 410. The decedent herein was the promoter, majority stockholder, and the principal officer of Transair which had one subsidiary corporation, Aero, the facilities of which it used for maintenance purposes. He also was a director and the owner of 10 per cent of the common stock of a third corporation which operated as a Cuban charter line. These three corporations make up the group which the petitioners contend amounted to a comprehensive air transportation business of the decedent. A corporation and its stockholders are generally treated as separate taxable entities, Burnet v. Clark, supra, and the business of the corporation is not considered to be the business of *218 the individual stockholders. Dalton v. Bowers, 287 U.S. 404Estate of William P. Palmer, Jr., 17 T.C. 702, and Jan G. J. Boissevain, supra, Langdon L. Skarda, 27 T.C., filed October 31, 1956. The petitioners' argument on this point is similar to the argument that was unsuccessfully offered by the taxpayer in Dalton v. Bowers, supra, and A. Kingsley Ferguson, 16 T.C. 1248. It is argued that the several corporations were only instrumentalities of the taxpayer's comprehensive business scheme and hence the debts arising from worthless loans to the several corporations were bad debts incurred in his air transportation business. We do not believe that the petitioners have shown that the decedent was engaged in what might be called in broad terms an air transportation business. It may be that he had more extensive plans for the future but the record shows only that he was the promoter, developer, financer, majority stockholder, and principal officer of Transair, the financer and presumably principal officer of its subsidiary, Aero, and a minority stockholder, a director, and the financial supporter of Expreso. We are faced *219 with much the same type of situation as that which was present in Burnet v. Clark, supra, and we have found as an ultimate fact that the particular businesses of Transair, Aero, and Expreso were not the business of the decedent. His business can only be said to have been that of a stockholder and officer of several corporations. In Charles G. Berwind, 20 T.C. 808, affirmed per curiam 211 Fed. (2d) 575 (C.A. 3, 1954), this Court said on page 815: "If the corporate form of doing business carries with it tax blessings, it also has disadvantages; so far as the petitioner is concerned, this case points up one of the corporate form's disadvantages. The petitioner can not appropriate unto himself the business of the various corporations for which he works." In the Berwind case, supra, the taxpayer who was an officer of 9 corporations, a director of 18, and a stockholder in 25, argued that his trade or business was that of being an officer and director in various affiliated corporations. We held that such activities did not constitute a trade or business within the meaning of section 23(k)(4); we think that the same conclusion should be reached in *220 this case. In A. Kingsley Ferguson, supra, the taxpayer contended that his business was in the promotion and organization of low-cost housing. As in the instant case, Ferguson's argument was that throughout all of his business endeavors in the general field of wood products there was the "single identifying thread" of the mass production of low-cost housing and that the pursuit of this goal was his particular business. We held that Ferguson's business was no more than being the president or general manager of his particular corporation. Similarly, we are not convinced here that the decedent's business was a comprehensive enterprise in the air transportation field in which each of the corporations was only an instrumentality. On the authority of Dalton v. Bowers, supra, and A. Kingsley Ferguson, supra, we do not consider that any of the decedent's loans to the three corporations were related to his business. In several cases, particularly Henry E. Sage, 15 T.C. 299, and Vincent C. Campbell, 11 T.C. 510, we have concluded that there are "exceptional situations where the taxpayer's activities in promoting, financing, *221 managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves." Charles G. Berwind, supra.Here the decedent organized and developed one corporation, financed the acquisition by that corporation of another existing corporation, purchased a minority stock interest in a third corporation, and became the financial backer of all three. We do not regard these activities as being so exceptional or extensive as to constitute a business separate and distinct from the business carried on by the several corporations themselves. Commissioner v. Smith, (C.A. 2, 1953) 203 Fed. (2d) 310, reversing Weldon D. Smith, 17 T.C. 135; Hickerson v. Commissioner, (C.A. 2, 1956) 229 Fed. (2d) 631, affirming a Memorandum Opinion of this Court [13 TCM 1180; T.C. Memo. 1954-237]; and Charles G. Berwind, supra.See also Wheeler et al. v. Commissioner, - Fed. (2d) - (C.A. 2, February 25, 1957). On the facts of record it is impossible for us to hold, and petitioners do not seriously *222 contend, that the debts here in question became wholly worthless prior to decedent's death in 1948. Since we have concluded that these debts were not "business" debts deductible under section 23(k)(1) but were non-business debts within the meaning of section 23(k)(4), no deduction is available to petitioners on account of debts "recoverable only in part." Therefore, it is not necessary for us to determine whether the debts became partially worthless prior to November 8, 1948, or the amounts in which they were recoverable. Turning to the issue of whether petitioners are entitled to the deductions claimed on account of the stock of Transair and Expreso becoming worthless in the taxable year, we must distinguish between decedent's position immediately prior to his death as a creditor of these corporations and his position as a stockholder. As a creditor, it may be an understatement to say that his position was a gloomy one; as a stockholder, his prospects of recovering any part of his investments were hopeless. Respondent does not contend on this issue that decedent's stock became worthless in a year prior to 1948. His principal contention is that no "identifiable event", as that *223 term is commonly understood, occurred in 1948 prior to decedent's death. In considering this problem the following quotation from Sterling Morton, 38 B.T.A. 1270, pp. 1278, 1279, succinctly sets out the principles appropriate to its solution: "* * * it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called 'identifiable' in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. "The ultimate value of stock, and *224 conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some 'identifiable event' in the corporation's life which puts an end to such hope and expectation. "There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and *225 since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an 'identifiable event' in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock, for already 'its value had become finally extinct.' * * *" It is our opinion that a realistic appraisal of the facts presented by the record herein requires a conclusion that this is such "an exceptional case" and that decedent's stock in Transair and Expreso became worthless in 1948 prior to decedent's death, even though it be conceded arguendo that no "identifiable events" occurred until later. [4]
The theory underlying petitioners' alternative argument that the deductions claimed for bad debts and stock losses are deductible under section 23(e) is set forth in petitioners' reply brief as follows: "The theory of deducting the decedent's *226 stock and bad debt losses under subdivision (e) as losses incurred in trade or business is that if the Court were to find that the decedent's domination over the corporate instrumentalities was so complete as to warrant disregard for their separate identities for tax purposes, as they were in large measure disregarded by the decedent in his business operations, then the separate characterizations of 'stock' and 'debt' would lose significance and become virtually mere book entries in the books of account of the decedent's business. But as long as form is respected and the descriptive terms 'stock' and 'debt' remain legally applicable to the decedent's interests the respondent is probably correct in his contention that worthless stock and bad debt losses as such are to be deducted only under the specific provisions of the statute applicable to those types of losses." That part of our opinion which deals with the first issue considered herein will also serve to dispose of this argument. Decision will be entered under Rule 50. Footnotes
1. This figure is stipulated although it appears to be inaccurate to the minor extent of one cent.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. (k) Bad Debts. - (1) General Rule. - Debts which became worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer other than a corporation, with respect to a nonbusiness debt, as defined in paragraph (4) of this subsection. * * * ↩
3. (g) Capital Losses. - (2) Securities Becoming Worthless. - If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets.↩
4. Under the unusual facts presented by the instant case, petitioners contend that decedent's death constituted an "identifiable event", citing Squier v. Commissioner, 68 Fed. (2d) 25↩.